# Illinois Official Reports

## Appellate Court

***People v. Boling*, 2014 IL App (4th) 120634**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRANDON M. BOLING, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0634 |
| Filed | March 12, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for two counts of predatory criminal sexual assault of a child were reversed and the cause was remanded for a new trial where the evidence was closely balanced and defendant established plain error based on the cumulative effect of errors that threatened to tip the scales of justice against him, including the improper admission of a nurse's testimony that was not relevant to her examination of the victim as required by section 115-13 of the Code of Criminal Procedure, the improper admission of testimony suggesting that defendant had been accused of prior similar sexual misconduct, the trial court's failure to conduct a hearing on the admissibility of prejudicial out-of-court statements with respect to the steps of the investigation, the failure to instruct the jury on the limited purpose of certain evidence, and the improper attempts to bolster the victim's credibility. |
| Decision Under Review | Appeal from the Circuit Court of Coles County, No. 11-CF-323; the Hon. James R. Glenn, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on          Michael J. Pelletier, Karen Munoz, and Allen H. Andrews (argued),
Appeal              all of State Appellate Defender's Office, of Springfield, for appellant.


                    Brian Bower, State's Attorney, of Charleston (Patrick Delfino, David
                    J. Robinson, and Kathy Shepard (argued), all of State's Attorneys
                    Appellate Prosecutor's Office, of counsel), for the People.

Panel               JUSTICE STEIGMANN delivered the judgment of the court, with
                    opinion.
                    Presiding Justice Appleton and Justice Holder White concurred in the
                    judgment and opinion.

## OPINION

¶ 1    In February 2012, a jury convicted defendant, Brandon M. Boling, of two counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2010)). In April 2012, the trial court sentenced defendant to two consecutive terms of 31 years in prison.

¶ 2    Defendant appeals, arguing that (1) hearsay statements of the victim, K.A., were improperly admitted under section 115-10 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115-10 (West 2012)) because those statements described (a) events that were not elements of the charged offenses and (b) criminal offenses against someone else; (2) the State improperly elicited hearsay statements that revealed previous allegations of sexual abuse against defendant; (3) sexual assault nurse examiner Noelle Cope was not qualified to offer her opinion that the victim's complaints were credible; and (4) the prosecutor improperly commented upon the victim's credibility in closing argument. We reverse defendant's convictions and remand for a new trial.


¶ 3                          I. BACKGROUND
¶ 4                       A. The State's Charges
¶ 5    In July 2011, the State charged defendant with three counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2010)) and one count of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 2010)). (The State dismissed the count of aggravated criminal sexual abuse prior to trial.)

¶ 6    The State's charges of predatory criminal sexual assault of a child alleged that between August 2010 and May 2011, defendant (born November 25, 1974) committed various acts of sexual penetration upon his girlfriend's daughter, K.A. (born October 8, 2002), including placing (1) his penis in her sex organ, (2) his penis in her anus, and (3) his mouth on her sex organ.

¶ 7                    B. The State's Motion *in Limine* Pursuant to Section 115-10

¶ 8        In January 2012, the State filed a "motion *in limine* to admit statements" pursuant to section 115-10 of the Code. Specifically, the State sought to admit statements K.A. made in July 2011 to (1) her mother, Jamie Burwell; (2) Burwell's sister, Ryan Reardon; and (3) Lieutenant Detective Jonathan Seiler. Over the course of two days in January and February 2012, the trial court held a hearing pursuant to section 115-10(b)(1) of the Code (725 ILCS 5/115-10(b)(1) (West 2012)) to determine the admissibility of K.A.'s hearsay statements.

¶ 9                             1. *K.A.'s Statements to Burwell*

¶ 10       Burwell testified that prior to July 9, 2011, she was in a dating relationship with defendant. Defendant did not live with Burwell permanently, but he would regularly travel from his Missouri residence to Mattoon, Illinois, where he would spend weekends with Burwell and K.A. at Burwell's apartment.

¶ 11       On July 9, 2011, based on "some information" that Burwell received from Reardon, she had a conversation with K.A. about "good touches versus bad touches." Present for this conversation were Burwell, K.A., Reardon, and Reardon's daughter, A.W. (born July 2002). Burwell told K.A. to tell her if anybody ever touched her in her "bad spot" (her vagina). When asked by the State if K.A. made any statements during this conversation, Burwell testified as follows:

> "[K.A.] told me that [defendant] was kissing her neck one day and that he left a red mark. She asked me what it was. I told her I didn't know, and she said that he made her put a cold spoon on it so the mark would be gone before I came home from work."

When asked if she recalled any other statements K.A. made, Burwell said, "No. My mind went crazy at that time."

¶ 12       Burwell testified further that on July 17, 2011, she and K.A. were alone in her bedroom. K.A. asked Burwell what the "bottle of stuff" was in her dresser drawer. Burwell looked in her drawer and identified a bottle of personal lubricant. K.A. told her that defendant "put it on her and put it on himself."

¶ 13                            2. *K.A.'s Statements to Reardon*

¶ 14       Reardon testified that on the evening of July 8, 2011, she was playing dominoes at her apartment with Burwell, defendant, and defendant's cousin, Fernandez, who was in town to help defendant work on a car. (Fernandez's last name does not appear in the record.) When Burwell and defendant left to get a deck of playing cards, Fernandez asked Reardon if he could spend the night because he needed to talk to her about "some things." Reardon agreed and had a conversation with Fernandez during the early morning hours of July 9. Reardon did not testify at the hearing as to the nature or details of that conversation.

¶ 15       At approximately 7 or 8 a.m. on July 9, 2011, after staying up all night, Reardon and Fernandez went to Burwell's apartment. After defendant and Fernandez left the apartment, Reardon told Burwell what she heard from Fernandez. Reardon and Burwell spoke alone in Burwell's bedroom for approximately 30 to 45 minutes, during which time "there was a lot of crying and stuff because there was so much that [Reardon] had heard." Reardon talked with Burwell about having a conversation with K.A. and A.W. about good touches and bad touches.

When K.A. and A.W. knocked on the bedroom door, Reardon let them into the room so she could talk with them.

¶ 16    Reardon explained to K.A. and A.W. that good touches are things like hugs and kisses from mom or grandma, and bad touches are touches to the private areas that should only be done by a doctor. Burwell was in the room at the beginning of this conversation, but she left at some point. The entire conversation lasted approximately 5 to 10 minutes. Reardon told K.A. not to be scared to tell her if someone gave her a bad touch because she would make sure it never happened again. K.A. then asked Reardon whether anything would happen to the family dog or her guinea pigs if she told. Reardon assured her that nothing would. Reardon testified that "[K.A.] took a great big deep breath, and like her shoulders relaxed, and she just came forth and started telling all kinds of stuff."

¶ 17    K.A. told Reardon that defendant would take her into Burwell's bedroom and put her on Burwell's bed. K.A. demonstrated for Reardon how she would try to pull her underpants up when defendant would pull them down. K.A. told Reardon that defendant "put his privates on her privates, and on her bottom" and "put his mouth on her privates." K.A. pointed to her vagina when she referred to her privates. Reardon asked K.A. if defendant's privates went inside of her privates, to which K.A. responded that defendant's privates were "on top" of her privates. K.A. also said defendant kissed her neck, leaving a red mark, and used a cold spoon from the freezer to make the redness go away before Burwell got home. K.A. stated that defendant "told her that he could love her like he loves her mom, and he was showing her how you love each other." Following this conversation, Reardon and Burwell contacted the police.

¶ 18                        3. *K.A.'s Recorded Statements to Seiler*

¶ 19    Seiler testified that he received specialty training at Finding Words, which specializes in the interviewing of child sex victims. On July 9, 2011, Seiler conducted an audio and video-recorded interview of K.A. The recording of that interview was played in its entirety at the hearing.

¶ 20    During the interview, Seiler showed K.A. anatomically correct drawings of a nude girl and a nude boy and asked her to identify various parts of the male and female body. K.A. identified the female genitals as the "woo-woo," the female breasts as "boobies," the buttocks as the "butt," and the male genitals as "privates." K.A. told Seiler that defendant touched her (1) on the outside and inside of her woo-woo and butt with his fingers; (2) on the inside of her woo-woo and butt with his privates; and (3) on her boobies, lips, and butt with his mouth. She explained that when this would happen, defendant kept trying to pull her pants down and she kept trying to pull them up. K.A. further stated that sometimes defendant's pants were on, and sometimes they were pulled down. When defendant touched her woo-woo or butt with his privates, his privates would be "shaking up and down."

¶ 21    K.A. told Seiler that defendant touched her on her woo-woo or butt with his fingers or privates three or four times when she was eight years old (her age at the time of the interview). Each time, he did so in Burwell's bedroom with the door locked when Burwell was not home. K.A. told Seiler that "usually" Kim Stone–Burwell's "best friend"–was present at the apartment when defendant touched her. However, K.A. asserted that Stone did not know what was happening in the bedroom because defendant would always lock the bedroom door and tell Stone "something different." After these incidents, defendant would tell K.A. not to tell her

- 4 -

mom or else he would not let her see Jasper, the dog that he took care of, and he would take away her guinea pigs. K.A. told Seiler that she believed defendant, adding that she did not want to tell on him because then he would leave, her mom would get mad, and he would tell her mom something different.

¶ 22       When Seiler asked K.A. if she had ever seen defendant "do this to someone else," K.A. said "no," but then described an incident in which she, defendant, and A.W. were playing hide-and-seek at Burwell's apartment when no one else was home. While K.A. was hiding, defendant found A.W. and took her into Burwell's bedroom. K.A. could hear A.W. "hollering" for her and yelling "[K.A.], help! Help! Help!" K.A. initially did not come out of her hiding spot because she was scared that "it might happen to [her,] too." K.A. eventually went to the bedroom and found it locked. She was able to unlock the door with her finger, but she could not open it because defendant had something blocking the door. K.A. told Seiler that she did not know what happened in the bedroom, and A.W. did not tell her, but K.A. stated, "I figured it was what was happening to me."

¶ 23                           4. *The Court's Section 115-10 Ruling*
¶ 24       At the conclusion of the hearing, the trial court ruled that all of K.A.'s aforementioned statements were admissible under section 115-10 of the Code.

¶ 25                 C. The State's Motions *in Limine* as to Evidence of Other Crimes
¶ 26       The State filed two separate motions *in limine* to admit evidence of defendant's other crimes, specifically his criminal sexual conduct with (1) A.W. and (2) his two daughters, K.S.B. and K.R.B. The State argued in both motions that such other crimes evidence was admissible under (1) the common-law doctrine allowing evidence of other crimes to show a common design, scheme, or plan, and (2) section 115-7.3(b) of the Code, which allows evidence of other, similar crimes to show propensity in cases involving predatory criminal sexual abuse and other enumerated sexual offenses. See *People v. Donoho*, 204 Ill. 2d 159, 176, 788 N.E.2d 707, 718 (2003) ("[T]he legislature enacted section 115-7.3 to enable courts to admit evidence of other crimes to show defendant's propensity to commit sex offenses if the requirements of section 115-7.3 are met.").

¶ 27                           1. *Defendant's Crimes Against A.W.*
¶ 28       In support of its motion *in limine* as to defendant's crimes against A.W., the State presented a recording of Seiler's interview of A.W., which he conducted immediately after his interview of K.A. In the interview, A.W. detailed two instances of sexual abuse by defendant, including an instance in Burwell's bedroom during which K.A. attempted to get inside but could not because defendant had blocked the door. The court granted the State's motion *in limine*, ruling that "the testimony of A.W. can come in as other crimes evidence, and also pursuant to section 115-7.3 [of the Code]."

¶ 29                           2. *Defendant's Crimes Against K.S.B. and K.R.B.*
¶ 30       In support of its motion *in limine* as to defendant's crimes against K.S.B. and K.R.B., the State presented recordings of separate January 2012 interviews of those girls conducted by Vicki Joseph of the Amy Center in Mount Vernon, Illinois. Both girls described incidents of

criminal sexual abuse, including penetration, committed by defendant upon them 11 to 12 years earlier, when they were between the ages of 2 and 5. The trial court ruled that the evidence of defendant's crimes against K.S.B. and K.R.B. was admissible under neither the common-law doctrine to show a common scheme, plan, or design, nor under section 115-7.3(b) of the Code. Accordingly, the court denied the State's motion *in limine* as to the evidence of defendant's crimes against K.S.B. and K.R.B.

¶ 31                                                    D. Trial

¶ 32        The parties presented the following pertinent evidence at defendant's February 2012 jury trial. (As we will discuss further in our analysis section, because defendant asserts plain error, his claims require us to determine whether the evidence at trial was closely balanced. Accordingly, we set forth the evidence in detail.)

¶ 33                                            1. *The State's Evidence*
¶ 34                                             a. K.A.'s Testimony
¶ 35        In response to leading questions, K.A. testified that defendant touched her on her chest, her "front bad spot," and her "back bad spot," which she identified as her "bottom." K.A., however, testified that she did not know, or could not remember, (1) what he used to touch her in those places; (2) how often he touched her; (3) how old she was when he touched her; (4) whether he touched her on the inside or outside; (5) whether he put anything on her when he touched her; or (6) whether he said anything to her when he touched her.

¶ 36        K.A. recounted that on one occasion, defendant made her put a spoon in the freezer and then on her neck to make a red spot go away. However, she could not remember how the red spot got on her neck. When asked if her clothes were on when defendant would touch her bad spots, K.A. testified, "He would try to pull them down, but I would put them back on." When asked if she ever saw any of defendant's body parts when he touched her, K.A. said, "No." However, she said, "I don't know" when asked if "any of his body parts that you wouldn't ordinarily be able to see" touched her. K.A. confirmed that she had her ninth birthday on October 8, 2011, but she could not remember whether defendant touched her before or after that date.

¶ 37                                             b. Burwell's Testimony
¶ 38        Burwell testified that she began dating defendant in June 2009 and she was happy in the relationship. Defendant appeared to get along well with K.A., and Burwell did not notice anything that caused her concern. After losing his job, defendant offered to begin babysitting K.A. while Burwell was at work.

¶ 39        Burwell testified about her July 9 conversation with Reardon, as follows:

> "[THE STATE]: Did you have a conversation with [Reardon] on July 9th of last year?
>
> A. Yes, I did.
>
> Q. And was the nature of that conversation–without getting into the specifics of what [Reardon] may have said, what was the nature of that conversation?
>
> A. Um, it was about some stuff that [defendant] had been accused of.

Q. Okay. Did [Reardon] want to have a conversation with your daughter?

A. Yes.

\*\*\*

Q. Now, what was the nature of the conversation that [Reardon] wanted to have with [K.A.]?

A. Good touch/bad touch.

\*\*\*

Q. Now, what do you mean by good touch/bad touch?

A. Well, you know, is anybody–well, I mean like the good touch/bad touch, has anybody, you know, ever touched you in a spot that they shouldn't have, or the manner that they shouldn't have."

¶ 40 Burwell testified that she did not want to have the conversation with K.A. about good touches and bad touches because she thought K.A. would have told her if something was going on. Burwell was not present for the entire conversation between Reardon and K.A. because she was getting dressed and her "mind was just all over the place." When asked what she heard K.A. say during the conversation, Burwell testified as follows:

"She had stated to me that [defendant] was kissing on her neck, called her what he called me, and that he had left a red mark on her neck, and that he made her put a cold spoon on it so the marks would be gone before I came home from work."

Burwell testified that defendant called her "Baby," but she never heard defendant call K.A. that name. After K.A. made the aforementioned statements, Burwell left the room and did not hear anything else K.A. said.

¶ 41 Burwell also testified, consistent with her testimony at the section 115-10 hearing, about K.A.'s statements regarding the bottle of personal lubricant in her dresser drawer. The trial court admitted that bottle of lubricant into evidence.

¶ 42 Finally, Burwell testified that Stone, her former friend and neighbor, would occasionally babysit K.A. at Burwell's apartment. Burwell was no longer friends with Stone because she learned that (1) Stone was present at her apartment "when some of the stuff was going on with [K.A.]" and (2) defendant had an affair with Stone while he was dating Burwell. Burwell testified that she learned of that information after K.A. revealed her claims of sexual abuse against defendant.

¶ 43 c. Reardon's Testimony

¶ 44 Reardon testified about her conversation with Fernandez, as follows:

"[THE STATE]: \*\*\* Without going into the details of the conversation, did you have a conversation with Fernandez?

A. Yes, I did.

Q. Who was or who is Fernandez?

A. He is a cousin of [defendant]. And he was in town to help fix his friend Amy's daughter's car.

Q. Okay. And did Fernandez request to have a private conversation with you?

A. Yes.

- 7 -

Q. Okay. And by private, was that conversation intended to be outside the presence of [defendant]?

A. Yes. My sister–[defendant] had left to go get a deck of cards. And when they left for that short period of time, [Fernandez] said, 'Ryan,' he goes, 'I need to talk to you about some things about [defendant].'

He said, 'When we get done playing cards, can I stay here and talk to you afterwards, and stay here till daylight?'

Q. Okay. Before you go any further. Did you in fact have a conversation with Fernandez?

A. Yes.

Q. Regarding [defendant]?

A. Yes.

Q. Okay. Based upon the conversation that you had with Mr.–with Fernandez about [defendant], did you then in turn have a conversation with your sister, [Burwell]?

A. Yes.

Q. Okay. And based upon your conversation with Fernandez, and based upon your conversation with your sister, did you then have a conversation with [K.A.]?

A. Yes, I did.

Q. Okay. Can you tell us the circumstances of that, please?

A. I called her to the bedroom along with my daughter [(A.W.)] and did a double, you know, talk about the good touch and the bad touch."

¶ 45 Reardon then testified about her conversation with K.A. regarding good touches and bad touches, which was largely consistent with her testimony at the section 115-10 hearing. Specifically, Reardon testified that K.A. told her (1) defendant tried to pull her pants down on Burwell's bed and she tried to pull them back up; (2) defendant put a red spot on her neck and made her put a cold spoon over it before Burwell got home from work; (3) defendant told her that "this is how people love each other"; (4) defendant put his privates on her privates; (5) defendant put his mouth on her privates; (6) defendant touched her bottom; and (7) defendant kissed her neck and breasts, leaving red spots that Reardon interpreted to be hickeys.

¶ 46 At trial, Reardon testified for the first time that during her conversation with K.A. about good touches and bad touches, K.A. told her that defendant took lotion from Burwell's drawer and put it on him and her. After K.A. pointed to the drawer, Reardon looked inside and found a bottle of K-Y Jelly.

¶ 47 Later in Reardon's testimony, the State asked more questions relating to her conversation with Fernandez:

"Q. Ms. Reardon, going back to the conversation, the good touch/bad touch conversation you had with [K.A.] Was that based upon the information that you received from Fernandez?

A. Yes.

Q. Okay. And did you have any reason to believe–reason to feel that you needed to have a conversation with [K.A.] prior to your conversation with Fernandez regarding good touches and bad touches?

A. Um, no.

Q. Okay. Ms. Reardon, prior to July 9th–prior to July 9th of 2011–and maybe I should clarify. Was your conversation with [K.A.] on July 9th?

A. Yes.

Q. So, your conversation with Fernandez was on the evening of July 8?

A. Actually, it was probably at two–three o'clock in the morning on July 9th.

Q. Okay. So, just hours before your conversation with–

A. Yes."

¶ 48 Finally, on redirect examination, the State again asked Reardon questions about her conversation with Fernandez, as follows:

"Q. With respect to Fernandez, why did he request to stay at your place that night?

A. When they had left to get cards, he approached me. And it was kind of, 'Ryan, I really need to talk to you about some things about [defendant], and it is concerning the girls.'

And he said, 'And I've been wanting to talk to your sister.'

[DEFENSE COUNSEL]: Judge–

[THE COURT]: Sustained."

¶ 49                                    d. Cope's Testimony

¶ 50 Cope, who was a sexual assault nurse examiner (SANE), began her testimony by describing her credentials in the field of sexual assault investigations, including (1) her bachelor's and master's degrees, (2) her clinical certifications, (3) her memberships in several professional organizations, (4) her adjunct faculty status at several universities, (5) her multiple professional awards, and (6) her past experience testifying as an expert on sexual assault in civil and criminal cases throughout Illinois. Cope testified that she was not a forensic interviewer. Instead, her SANE training taught her how to interview children for medical purposes. The trial court allowed Cope to testify as an expert.

¶ 51 Cope met with K.A. on July 19, 2011, for the purpose of a medical interview followed by a physical examination. Cope knew ahead of time that K.A.'s allegations involved touching of the genitals with the hand, and possibly with the penis. She did not know the alleged perpetrator's identity.

¶ 52 Cope testified that when she asked K.A. if anyone had ever touched her bad spot or her bottom in a way that made her uncomfortable, K.A. told her that defendant did. The following exchange then occurred on direct examination:

"[THE STATE]: [D]id you ask her what exactly it was that he did that made her uncomfortable?

[COPE]: Yes, I did. I asked her, you know, can you tell me more about what happened that made you feel uncomfortable?

And she told me that one day she was at home, and he was babysitting, and she was there with her cousin, [A.W.], as well. And that they are watching TV. And that he took her cousin into the bedroom and shut the door and locked it. She went to the door. She tried to get into the bedroom, but it was locked. A while later, they came out of the bedroom, and then–

Q. Let me interrupt you. I apologize.

- 9 -

A. That's okay.

Q. Was she able to state how long they were in the bedroom together?

A. I asked her how long, and she said she did not know.

Q. Okay. Did you then ask her what happened after they exited the bedroom?

A. I did. And then, she told me that, after they exited the bedroom, that he took her into the bedroom."

¶ 53    K.A. told Cope that when defendant took her into the bedroom, defendant (1) touched her bad spot with his bad spot (his penis); (2) touched her bottom with his bad spot; (3) touched her bad spot with his mouth; (4) touched her bad spot with his fingers and hand; (5) had her touch his bad spot with her hand; and (6) asked her to touch his bad spot with her mouth, but she refused. When Cope asked K.A. if defendant rubbed his bad spot on top of her bad spot, or whether he put his bad spot into her bad spot, "[K.A.] felt that she knew definitely it was on top of her bad spot, but she said she was not sure that it went inside of her bad spot." K.A. told Cope that defendant "rubbed his bad spot on the outside of her bottom." Cope testified that after defendant left the bedroom with K.A., he brought A.W. back into the bedroom.

¶ 54    K.A. told Cope that these types of incidents between her and defendant "happened lots of times," although she was unable to say exactly how many. The incidents would usually occur in Burwell's bedroom when defendant was babysitting K.A. K.A. also told Cope that on one occasion, defendant put lotion on her stomach and rubbed his bad spot on her belly.

¶ 55    When Cope asked K.A. whether defendant told her not to tell anyone about his conduct, K.A. said that defendant threatened to take away or kill her guinea pigs, and prevent her from seeing the dog, Jasper, if she told. The following exchange then occurred on direct examination:

"[THE STATE]: Did you have an opportunity then to ask her whether or not she was angry or frightened by any of this?

[COPE]: I did. I asked her how she was feeling not that it–well, actually, I asked her why she finally did decide to tell. If she was afraid that she wasn't going to get to see her guinea pig or her dog, then, you know, why did you tell?

And she said she had told her mom because she heard that maybe it had happened to some other kids. So, she felt safe in telling."

¶ 56    During her physical examination of K.A., Cope did not find any indications of sexual abuse or sexually transmitted disease.

¶ 57    On the State's redirect examination, Cope gave the following testimony:

"[THE STATE]: When you conduct these examinations, do you have any hope or expectation as to what's going to come out of that examination?

[COPE]: Um, the expectation that I–my–I feel like the big part of my job is reassuring these kids when they come in that their bodies [are] okay.

I know that the likelihood of me finding a positive physical finding is probably going to be minimal. But the kids have, you know–but like in [K.A.'s] case, she gave me a really good–what I felt was a credible history."

¶ 58                              e. Seiler's Testimony

- 10 -

¶ 59    In his trial testimony, Seiler recounted his interview with K.A., including K.A.'s description of defendant's abuse of her and the incident in which defendant took A.W. into Burwell's bedroom during a game of hide-and-seek. The full recording of Seiler's interview of K.A. was then admitted into evidence and played for the jury.

¶ 60    Seiler also testified that on July 12, 2011, he and defendant met in Mount Vernon, Illinois, for the purpose of a voluntary interview. During that interview, defendant admitted that "it was a pretty common occurrence" for him to babysit K.A. when Burwell was at work. Defendant also admitted that he would babysit A.W. on occasion. However, defendant denied any inappropriate contact with K.A. or A.W.

¶ 61    Seiler testified that in January 2012, he went to Burwell's apartment to secure the bottle of personal lubricant as evidence. While there, Seiler video-recorded himself using his fingernail to unlock Burwell's bedroom door, just as K.A. told him she had done when defendant was in the bedroom with A.W. That video was played for the jury.

¶ 62                              *2. Defendant's Evidence*

¶ 63    Defendant testified that he had a typical relationship with K.A. and she was glad to see him every time he would visit. He denied ever inappropriately touching K.A. or telling her that he would keep her from seeing the dog or her guinea pigs. Defendant admitted being alone with K.A. in Burwell's apartment at times. However, he denied ever being alone with K.A. between the time frame alleged in the charging information (August 2010 through May 2011).

¶ 64    Defendant testified that in December 2010, he had a conversation with K.A. about good touches and bad touches. He decided to do this because his sons' mother sent him a text message about a child kidnapping, which led him to ask his two sons–four and six years old at the time–whether they knew not to get into a stranger's car. After speaking with his sons, defendant convinced Burwell to have a similar conversation with K.A. Defendant and Burwell asked K.A. whether she would get into a car with someone if they had a dog, to which K.A. replied, "Yeah, I will get in the car." Burwell and defendant then explained to K.A. the difference between good touches and bad touches, and told her never to get into a stranger's car. Defendant then told K.A. to alert her mother if anyone gave her a bad touch.

¶ 65    Defendant also testified that the first time he babysat K.A., he noticed a red mark on the back of her neck. K.A. was hesitant to let defendant look at or touch the mark. Defendant called Burwell at work to inform her that K.A. had the mark on her neck. While defendant waited for Burwell to arrive home, he had K.A. place a piece of ice on a spoon and then place the spoon over the red mark. Defendant testified that he wanted to see if the cold spoon would cause the mark to dissipate, which would tell him whether it was a simple bruise or something else. Instead of dissipating, the mark became agitated from the cold spoon. When Burwell arrived home, she gave K.A. Benadryl, which caused the mark to go away.

¶ 66    Defendant admitted having an affair with Stone. On July 9, 2011, Burwell called and told him that she was aware of the affair.

¶ 67    Defendant testified that during his July 12 interview with Seiler in Mount Vernon, Seiler repeatedly urged defendant to admit his guilt without first disclosing to defendant the crime he was suspected of committing. Eventually, Seiler accused defendant of sexually abusing K.A. and continued asking him to admit his guilt. Defendant denied doing anything wrong and

offered to submit deoxyribonucleic acid (DNA) and take a polygraph test. Ultimately, defendant told Seiler that if he was not going to be arrested, he would leave, which he did.

¶ 68                     3. *The State's Rebuttal Evidence*

¶ 69    Seiler testified that during his interview with defendant, he disclosed the nature of his investigation within the first 10 minutes, before he asked defendant to admit his guilt.

¶ 70    Sergeant David Vanderport testified that he accompanied Seiler to the interview of defendant in Mount Vernon. Vanderport corroborated Seiler's testimony that defendant was informed of the nature of the investigation before Seiler asked him to admit his guilt.

¶ 71    Burwell testified that she suffered a work-related injury in September 2010, which caused her to miss a week of work. She then took off work on December 22, 2010, and had surgery in January 2011, which caused her to miss work until February 8. Although she was not working from December 22, 2010, to February 8, 2011, she left the house to run errands and she attended physical therapy three times per week. During some of those times, defendant was alone in the apartment with K.A. The State offered into evidence, and the trial court admitted, medical paperwork to show the times that Burwell was not working due to her injury and surgery. Burwell also denied defendant's claim that she and defendant had a conversation with K.A. about good touches and bad touches.

¶ 72                 4. *The Jury's Verdict and the Trial Court's Sentence*

¶ 73    The jury found defendant guilty of two counts of predatory criminal sexual assault in that he (1) placed his penis on K.A.'s sex organ and (2) placed his penis on K.A.'s anus. The jury found defendant not guilty of predatory criminal sexual assault for placing his mouth on K.A.'s sex organ. The trial court later sentenced defendant as stated.

¶ 74    This appeal followed.

¶ 75                                II. ANALYSIS

¶ 76    Defendant argues that (1) K.A.'s hearsay statements were improperly admitted under section 115-10 of the Code because those statements described (a) events that were not elements of the charged offenses and (b) criminal offenses against someone else; (2) the State improperly elicited hearsay statements that revealed previous allegations of sexual abuse against defendant; (3) Cope was not qualified to offer her opinion that K.A.'s complaints were credible; and (4) the prosecutor improperly commented upon K.A.'s credibility in closing argument.

¶ 77    Initially, we note that defendant has forfeited each of the aforementioned claims of error by failing to object at trial or raise the issues in a posttrial motion. See *People v. Kitch*, 239 Ill. 2d 452, 460, 942 N.E.2d 1235, 1240 (2011). However, defendant argues that this court should consider his claims under the plain error doctrine, which permits a court of review to consider a forfeited error under the following circumstances:

> "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely

- 12 -

threatened to tip the scales of justice against him." *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 479 (2005).

Defendant confines his claims to the first prong of the plain error analysis, contending that the evidence at trial was closely balanced and the existence of the asserted errors threatened to tip the scales of justice against him. Under the plain error analysis, defendant bears the burden of persuasion. *Id.* at 187, 830 N.E.2d at 480.

¶ 78    Because the usual first step in plain error analysis is to determine whether any error occurred (*People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010)), we address defendant's contentions of error in turn. After determining whether error occurred, we turn to whether the cumulative errors threatened to tip the scales of justice against defendant, thereby requiring reversal of defendant's convictions.

¶ 79                              A. K.A.'s Hearsay Statements

¶ 80              1. *K.A.'s Statements Admitted Under Section 115-10 of the Code*

¶ 81    Defendant argues that the following hearsay statements of K.A., admitted pursuant to section 115-10 of the Code, were inadmissible: (1) K.A.'s statements regarding defendant kissing her breasts and neck, and placing a cold spoon over the resulting red mark on her neck; (2) K.A.'s statements regarding defendant's threats against the dog and guinea pigs; and (3) K.A.'s statements regarding defendant's apparent abuse of A.W. during the game of hide-and-seek. Although defendant does not challenge the reliability of these statements, he argues that they were inadmissible under section 115-10 of the Code because they "described events that were not elements of the charged offenses and *** described criminal offenses against someone else." We disagree.

¶ 82    Section 115-10 of the Code provides, in pertinent part, as follows:

"(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13, *** the following evidence shall be admitted as an exception to the hearsay rule:

***

(2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child *** either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement[.]" 725 ILCS 5/115-10 (West 2012).

¶ 83    The General Assembly enacted section 115-10 of the Code to allow admission of "detailed corroborative evidence of the child's complaint about the incident to another individual" out of a concern that "child witnesses, especially the very young, often lack the cognitive or language skills to effectively communicate instances of abuse at trial [citation], or may be impeded

- 13 -

psychologically in their efforts to do so." *People v. Bowen*, 183 Ill. 2d 103, 115, 699 N.E.2d 577, 584 (1998). While defendant is correct that the trial court admitted K.A.'s hearsay statements describing (1) events that were not elements of the charged offenses and (2) apparent criminal offenses against someone else, section 115-10 of the Code is, by its plain language, not limited to hearsay statements that directly describe the *elements* of the charged offense. *People v. Schmitt*, 204 Ill. App. 3d 820, 829, 562 N.E.2d 377, 384 (1990).

¶ 84    In *People v. Monroe*, 366 Ill. App. 3d 1080, 1089-90, 852 N.E.2d 888, 899 (2006), the trial court allowed the State to introduce, under section 115-10 of the Code, the hearsay statements of two child victims that the defendant made them tickle each other on their inner thighs while they were naked. The defendant argued that the evidence was improperly admitted under section 115-10 of the Code because he was not charged in relation to the tickling. *Id*. at 1090, 852 N.E.2d at 899.

¶ 85    The *Monroe* court undertook a two-part analysis. First, it determined whether the evidence of other crimes (the tickling) was admissible at all, regardless of the hearsay nature of the evidence:

> "The record reveals that when the children first complained to [the father and stepmother] about the defendant's abuse, they also described the tickling incidents. Furthermore, when the children reported the abuse to Nurse Kohler, they contemporaneously referred to the tickling incidents as well. Such testimony indicates that the defendant's requiring the children to tickle each other went hand-in-hand with his abuse of them. As such, the evidence of improper tickling was properly admitted to reflect the defendant's design, scheme, or plan of abusing the children." *Id.*

¶ 86    Next, after concluding that the other crimes evidence reflected the defendant's design, scheme, or plan of abusing the children, the court turned to whether the use of the hearsay statements for that purpose fell within the hearsay exception of section 115-10 of the Code:

> "[T]he trial court conducted a proper section 115-10 hearing outside the presence of the jury in order to determine that the time, content, and circumstances of the statements at issue provided sufficient safeguards of reliability. The trial court determined that the statements at issue were in fact reliable. [The children's father and stepmother] testified that when the children indicated to them that the defendant was abusing them, the children also indicated that the defendant required them to tickle each other while naked. [The father's and stepmother's] testimony as to the tickling went to the details of how the defendant was abusing the children. Such testimony was therefore not improper pursuant to section 115-10 [of the Code]." *Id*. at 1091, 852 N.E.2d at 900.

¶ 87    Consistent with the court's decision in *Monroe*, we hold that under section 115-10(a)(2) of the Code, a "matter or detail pertaining to any act which is an element of an offense" (725 ILCS 5/115-10(a)(2) (West 2012)) may include facts about the victim's relationship with the defendant if relevant to explain the context within which the alleged charged acts occurred. Our analysis is anchored to the purpose of section 115-10 of the Code, which is to address the difficulties of eliciting trial testimony from a child victim in a prosecution for sex crimes. *Bowen*, 183 Ill. 2d at 115, 699 N.E.2d at 584. Just as a child might be psychologically impeded–through embarrassment, fear, or other emotions–to testify at trial regarding the defendant's acts constituting the elements of the charged offense, so too might the child be reluctant to testify about the details of his or her relationship with defendant that, although not elements of the charged offense, are important and relevant to provide the jury with a

- 14 -

sufficiently complete understanding of the facts and circumstances surrounding the alleged criminal acts.

¶ 88    Using an example from this case, K.A.'s statement to Seiler that defendant's privates would be "shaking up and down"–a statement that defendant does *not* argue was inadmissible under section 115-10 of the Code–was not only relevant, but extremely probative of the elements of the charged offenses. The jury could infer from that evidence that defendant masturbated in front of K.A., which not only revealed the sexual nature of his relationship with her, but also corroborated her other claims. Because an eight-year-old girl would likely never describe a grown man's penis shaking up and down unless she actually witnessed it, that statement gave credibility to K.A.'s statements regarding the elements of the charged offenses. In this sense, the statements described a matter or detail pertaining to the acts that were elements of the offense. Not surprisingly, K.A. was reluctant to testify at trial not only about the elements of the charged offenses, but also about nearly all of the embarrassing aspects of her relationship with defendant, including the fact that she saw his privates shaking up and down.

¶ 89    Similarly, under section 115-10 of the Code, K.A.'s statements regarding defendant kissing her neck and breasts described details and matters pertaining to defendant's charged acts because they put those acts into the context of an inappropriate relationship between an adult man and an eight-year-old girl. Other evidence in that same category, but which defendant does *not* claim was inadmissible, included K.A.'s statements that defendant (1) would lock the door when he touched her in Burwell's bedroom; (2) called her "baby"; (3) said he was showing her how people love each other; (4) told her to keep the conduct a secret; and (5) put personal lubricant on her body and his own.

¶ 90    Such ancillary facts, which would be relevant and admissible through K.A.'s direct testimony, may be just as difficult to elicit at trial as the facts directly establishing the elements of the charged offense. If the only hearsay statements admissible under section 115-10 of the Code had been K.A.'s statements that defendant touched her "woo-woo" and "bottom" with his mouth and "privates" (statements *directly* establishing the acts that were elements of the charged offenses), the jury would be left with no context from which to assess the veracity of those claims. However, K.A.'s aforementioned statements about defendant's other inappropriate–albeit uncharged–behavior, of which only she and defendant had personal knowledge, corroborated her claims and aided the jury in determining whether defendant committed the acts constituting elements of the charged offenses. *People v. Park*, 245 Ill. App. 3d 994, 1002, 615 N.E.2d 753, 758 (1993) ("[W]hen sex crimes are involved, prior acts between the same parties are generally admissible to show the relationship and familiarity between the parties and to corroborate the complaining witness' testimony as to the act relied upon for conviction.").

¶ 91    K.A.'s statements regarding the cold spoon incident and defendant's threats against the dog and guinea pigs were also admissible under section 115-10 of the Code because they revealed not only the inappropriate nature of defendant's relationship with K.A., but also the fact that defendant took measures to conceal that relationship from others. See *People v. Rushing*, 192 Ill. App. 3d 444, 452, 548 N.E.2d 788, 793 (1989) ("Due to the contemporaneous nature of the threat with the acts and the challenges made to [the child victim's] credibility, the threat has become integrally intertwined with the offense."). As was the case in *Rushing*, securing the victim's silence and preventing detection is an integral component of any ongoing

sexually abusive relationship between an adult and a child. Whatever the means, the perpetrator's methods of keeping the abuse secret is often integrally intertwined with the offense for purposes of section 115-10 of the Code. This is especially true in a case such as this, where the child victim's claims were (1) first made months after the alleged abuse, (2) denied outright by the defendant, and (3) uncorroborated by physical evidence. Under section 115-10 of the Code, K.A.'s statements regarding the cold spoon incident and defendant's threats to the dog and guinea pigs were admissible to show the nature of defendant's relationship with K.A. and his efforts to conceal the acts for which he was charged.

¶ 92      We also conclude that K.A.'s hearsay statements regarding defendant's apparent abuse of A.W. were admissible under section 115-10 of the Code. In the case of *People v. Embry*, 249 Ill. App. 3d 750, 763, 619 N.E.2d 246, 255 (1993), the trial court admitted, pursuant to section 115-10 of the Code, the statements of one child victim, H.P., regarding the defendant's abuse of her younger sister, A.P. H.P.'s statements at issue described her observations of the defendant's sexual conduct with A.P. occurring during a sleepover at which defendant abused both girls. This court in *Embry* held that H.P.'s statements about the defendant's abuse of A.P. "were properly admissible as components of the contemporaneous and ongoing series of events constituting *a matter or detail pertaining to the offense perpetrated against herself*." (Emphasis in original.) *Id*. (citing *Rushing*, 192 Ill. App. 3d at 452, 548 N.E.2d at 793).

¶ 93      In *People v. Peck*, 285 Ill. App. 3d 14, 17, 674 N.E.2d 440, 442 (1996), this court, citing *Embry*, held that whether a child declarant's statements about the defendant's acts upon another child are admissible under section 115-10 of the Code depends upon the particular circumstances of a given case. The following are some relevant considerations:

> "(1) the relationship of the declarant to the child upon whom the witnessed sexual act is perpetrated; (2) the proximity of such act–in time and place–to the act allegedly performed upon the declarant; (3) the similarity of the two acts; and (4) the existence of a common perpetrator. These considerations may be significant in explaining the declarant's willingness to submit to similar sexual acts, as well as her reluctance to resist, cry out, or complain to others." *Id*. at 17, 674 N.E.2d at 422-43.

¶ 94      Our conclusion that K.A.'s statements regarding defendant's apparent abuse of A.W. were admissible under section 115-10 of the Code is largely influenced by the context within which the statements were made. During her interview with Seiler (the recording of which was presented in full to the jury), K.A. gave a detailed description of defendant's sexual conduct with her, which she said always occurred in Burwell's bedroom, with the door locked, while defendant was babysitting her. After K.A. gave that description, Seiler asked, "Have you ever seen [defendant] do this to anybody else?" K.A. said, "No," but then she immediately described her observations during the incident involving A.W. Specifically, K.A. said that while defendant was babysitting her and A.W.–her cousin of the same age–he brought A.W. into Burwell's bedroom during a game of hide-and-seek and locked the door behind him. K.A. heard A.W. yelling her name and pleading for help. K.A. attempted to open the bedroom door, but it was blocked by something.

¶ 95      K.A.'s statements about the incident involving A.W. described an incident involving the same perpetrator, the same bedroom, the same period of time, and a victim with whom K.A. was close in age and relation. Under the considerations cited in *Peck*, K.A.'s statements regarding defendant's apparent abuse of A.W. were admissible under section 115-10 of the Code.

- 16 -

¶ 96 Further, aside from K.A.'s mere *observations* of the incident involving A.W., it was the *conclusions* K.A. drew from those observations that made her overall description of the incident most revealing of her own experiences with defendant. K.A. told Seiler that she did not know what defendant did to A.W. inside the bedroom, but "figured it was what was happening to [her]." Even though she heard A.W. pleading for help, she "was scared to come out" of her hiding spot because "it might happen to [her] too." The fact that K.A. concluded that defendant was committing similar sexual acts with A.W., based only upon what she saw and heard from outside the bedroom, was revealing of her own experiences with defendant. This glimpse into K.A.'s mental state during the incident involving A.W. corroborated K.A.'s claims and provided the jury with an understanding of the psychological aspects of defendant's abusive relationship with her. In this sense, K.A.'s statements described a matter or detail pertaining to the charged offenses.

¶ 97 As a final note regarding the incident involving A.W., we point out that although K.A.'s statements to Cope suggested that defendant's abuse of A.W. occurred immediately contemporaneous to his abuse of K.A., we do not factor Cope's testimony into our section 115-10 analysis. The State failed to include Cope's testimony in its motion *in limine* to admit statements pursuant to section 115-10 of the Code, nor was her aforementioned testimony presented at the hearing or considered by the trial court in making its section 115-10 ruling. Section 115-10 of the Code requires that (1) the "defendant be provided with the specific hearsay testimony of the child victim which will be presented at trial" and (2) the court hold a hearing to determine the reliability of a particular hearsay statement based upon evidence showing "a particularized guarantee of trustworthiness." *People v. Carter*, 244 Ill. App. 3d 792, 800-01, 614 N.E.2d 452, 457-58 (1993). Because neither of those requirements was met as to K.A.'s statements to Cope, we disregard Cope's testimony for purposes of our section 115-10 analysis.

¶ 98                    2. *K.A.'s Statements Admitted Under Section 115-13 of the Code*
¶ 99 Defendant also argues that portions of Cope's testimony regarding K.A.'s statements were inadmissible under section 115-13 of the Code, which provides as follows:

"In a prosecution for violation of Section *** 12-14.1 *** of the Criminal Code of 1961 or the Criminal Code of 2012, statements made by the victim to medical personnel for purposes of medical diagnosis or treatment[,] including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof[,] insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." 725 ILCS 5/115-13 (West 2012).

¶ 100 Specifically, defendant challenges Cope's testimony relating to (1) K.A.'s identification of defendant as her abuser, (2) K.A.'s statements regarding defendant's threats against the dog and guinea pigs, (3) K.A.'s description of the incident involving A.W., and (4) K.A.'s statement that she decided to tell Burwell about the abuse "because she heard that maybe it had happened to some other kids." The State argues that K.A.'s statements to Cope were admissible under section 115-13 of the Code.

¶ 101 This court has held that "in examining a child suspected to be a victim of sexual abuse, details of the sexual acts including how, when, and where the act occurred and who was

- 17 -

involved are pertinent information allowed under [section 115-13 of the Code]." *People v. March*, 250 Ill. App. 3d 1062, 1076, 620 N.E.2d 424, 435 (1993) (citing *People v. Roy*, 201 Ill. App. 3d 166, 178, 558 N.E.2d 1208, 1216 (1990)). In this case, K.A.'s statements to Cope identifying defendant as her abuser were admissible under section 115-13 of the Code because they explained who was involved in the sexual acts at issue. *March*, 250 Ill. App. 3d at 1076, 620 N.E.2d at 435.

¶ 102    In *Rushing*, 192 Ill. App. 3d at 453, 548 N.E.2d at 793-94, this court held that the victim's statements to a doctor regarding the defendant's threat to kill her family if she revealed the abuse were "relevant to [the victim's] state of mind and emotional condition" and admissible under section 115-13 of the Code. We conclude here as well that K.A.'s statement regarding defendant's threats to the dog and guinea pigs were relevant to her state of mind and emotional condition. *Id.* Cope testified that she asked K.A. if she was angry or frightened by defendant's threats, and K.A. responded that she was afraid. Accordingly, those statements were admissible under section 115-13 of the Code.

¶ 103    However, K.A.'s statement to Cope regarding defendant's apparent abuse of A.W. and her statement that she told Burwell of the abuse "because she heard that maybe it had happened to some other kids" were not reasonably pertinent to diagnosis or treatment and were therefore inadmissible under section 115-13 of the Code. The State offers no argument explaining how either of those statements could have been relevant to Cope's examination of K.A., nor did Cope's testimony give any indication that she used the information gleaned from those statements in her diagnosis or treatment of K.A. Those statements were admitted in error.

¶ 104           B. Hearsay Statements That Revealed Previous Allegations Against Defendant

¶ 105    Defendant next argues that the State improperly elicited hearsay statements that revealed previous allegations of sexual abuse against him. Specifically, defendant contends that Reardon's testimony about her conversation with Fernandez, and Burwell's testimony about her conversation with Reardon, improperly revealed that defendant had been accused of past sexual improprieties. The State responds that the statements at issue were not offered for their truth–that is, to prove that defendant had been accused of past sexual improprieties–but instead to explain why Reardon and Burwell had the conversation about good touches and bad touches with K.A.

¶ 106    In support of their respective positions, both the State and defendant cite cases in which out-of-court statements were offered to explain the steps of a police investigation. We find some of the principles involved in those cases applicable to the issues presented here. Although Reardon and Burwell were clearly not police officers, they did conduct something akin to an investigation into defendant's suspected abuse of K.A. based upon information received from Fernandez.

¶ 107    A police officer may testify as to the steps taken in an investigation of a crime "where such testimony is necessary and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 174, 572 N.E.2d 947, 954-55 (1991). "[O]ut-of-court statements that explain a course of conduct should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information." *People v. O'Toole*, 226 Ill. App. 3d 974, 988, 590 N.E.2d 950, 959-60 (1992). Testimony about the steps of an investigation may not include the *substance* of a conversation

- 18 -

with a nontestifying witness. *People v. Gacho*, 122 Ill. 2d 221, 248, 522 N.E.2d 1146, 1159 (1988); *People v. Jones*, 153 Ill. 2d 155, 160, 606 N.E.2d 1145, 1147 (1992); *People v. Johnson*, 202 Ill. App. 3d 417, 421-22, 559 N.E.2d 1041, 1044 (1990).

¶ 108    In *People v. Cameron*, 189 Ill. App. 3d 998, 1004, 546 N.E.2d 259, 263 (1989), this court discussed the theory upon which out-of-court statements are admitted to explain a course of police conduct and the danger of misuse of such statements, as follows:

> " 'In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct. His testimony that he acted "upon information received," or words to that effect, should be sufficient. Nevertheless, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great.' " *Id.* (quoting Edward W. Cleary, McCormick on Evidence § 249 (3d ed. 1984)).

See also *People v. Rice*, 321 Ill. App. 3d 475, 482, 747 N.E.2d 1035, 1041 (2001) ("The reality is that it will almost always be possible to describe testimony revealing the content of conversations with the police as evidence offered to shed light on the investigation of the crime rather than on the crime itself. If reviewing courts allowed the mere invocation of the words 'police procedure' to preclude further analysis, this limited exception would effectively swallow the hearsay rule with regard to police officers. The compelling protections that gave rise to the hearsay rules must not be so easily discarded."); Michael H. Graham, Graham's Handbook of Illinois Evidence § 801.5 (10th ed. 2010) ("This limited admissibility of investigatory background *** is still nevertheless unfortunately overly broad. Investigatory steps taken by a police officer are rarely more than marginally relevant at best, while the risk of jury misuse of the information at great expense to the accused is substantial.").

¶ 109    On the facts of this case, we conclude that Reardon's and Burwell's testimony went well beyond that which was necessary to explain their decision to speak with K.A. about good touches and bad touches. Both women testified, either directly or indirectly, about the substance of their conversations. Reardon testified that Fernandez requested to have a conversation with her about "some things about defendant" that "concern[ed] the girls." He requested this conversation to take place in private, specifically outside defendant's presence. After that conversation, Reardon spoke with Burwell, and then with K.A. about good touches and bad touches. Reardon testified that her conversation with K.A. about good touches and bad touches was based upon her conversation with Fernandez, and prior to her conversation with Fernandez she had no reason to have such a conversation with K.A. As if the jury would not have inferred it on its own, the State specifically asked Burwell about "the nature" of her conversation with Reardon, to which Burwell said, "it was about some stuff that [defendant] had been accused of."

¶ 110    At the very least, the out-of-court statements of Fernandez to Reardon and Reardon to Burwell suggested that defendant had been accused of sexual improprieties in the past. At worst, given Fernandez's specific reference to "the girls" (meaning eight-year-olds K.A. and A.W.), the jury could infer that defendant had engaged in sexual acts with girls of a similar age in the past. We deem the State's line of questioning to have been a transparent attempt to reveal for the jury the substance of Fernandez's accusatory statements to Reardon.

- 19 -

¶ 111 Although the State maintains that Fernandez's statements–whether express or implied–were offered to explain Reardon's and Burwell's conduct, and not to prove the truth of the matter asserted, the trial transcript belies this claim. To "fully explain" its case to the trier of fact (*Simms*, 143 Ill. 2d at 174, 572 N.E.2d at 955), the State could have properly elicited Reardon's testimony that, based upon a conversation with a third party, she decided to have a conversation with K.A. about good touches and bad touches. However, in addition to eliciting Reardon's testimony that her conversation with K.A. was based upon a conversation that she had with someone else, the State elicited testimony from Reardon and Burwell that revealed (1) the identity of the third party as defendant's cousin, (2) the topic of the conversation as defendant and "the girls," and (3) the nature of the conversation as "some stuff that [defendant] had been accused of." Notably, although the State had moved on to other topics of inquiry after Reardon explained that she chose to speak with K.A. based upon her conversation with Fernandez, the State *twice* redirected its examination of Reardon back to her conversation with Fernandez, eliciting testimony that further hinted at the substance of Fernandez's statements.

¶ 112 Moreover, unlike the typical situation in which a crime is discovered and an investigation follows, Fernandez made his statements to Reardon *before* either of them knew of defendant's crimes against K.A. and A.W. This is significant because whatever information Fernandez told Reardon must have involved something about defendant's past unrelated to K.A. and A.W. Given Reardon's conclusion that she needed to talk with K.A. about good touches and bad touches based on what Fernandez told her, the jury could infer that defendant had been accused of similar sexual acts in the past. In this sense, Reardon's testimony about her conversation with Fernandez essentially constituted propensity evidence.

¶ 113 In *People v. Lewis*, 165 Ill. 2d 305, 345-46, 651 N.E.2d 72, 91-92 (1995), the supreme court stated the following regarding evidence of past acts offered to explain an investigation:

"[E]vidence which suggests or implies that the defendant has engaged in prior criminal activity should not be admitted unless somehow relevant. The fact that such evidence comes to the jury by way of inference does not alter its potentially prejudicial character. ***

  ***

  *** [E]vidence of other crimes is not admissible merely to show how the investigation unfolded *unless* such evidence is also relevant to specifically connect the defendant with the crimes for which he is being tried. [Citations.] The limitation applies to prevent the risk of prejudice to a defendant even in the face of the State's legitimate need to present evidence of the steps in its investigation." (Emphasis in original.)

We cannot accept the State's assertion that it elicited the testimony at issue out of a legitimate need to explain its case to the jury. To the extent that it was necessary to explain why Reardon and Burwell decided to speak with K.A. about good touches and bad touches, such an explanation could have been given in a truthful and nonprejudicial manner by simply having Reardon testify that she decided to have the conversation based upon information that she received from a third party. Neither she nor Burwell needed to explain what the information was or from whom it came.

¶ 114    In *Cameron*, we suggested procedures the trial court should follow when confronted with the State's request to elicit evidence explaining the steps of a police investigation:

> "When an objection was first raised to [the officer's] testifying about what he was told by the confidential informant, the court should have conducted a hearing out of the presence of the jury to determine both the *scope* of these third-party out-of-court statements and the *need* for the jury to hear them. Had such a hearing been conducted in this case, the court could have directed that the improper portions of [the officer's] testimony be deleted, thereby permitting the State to provide its legitimate explanations for police conduct, while protecting the defendant against prejudicial hearsay statements." (Emphases in original.) *Cameron*, 189 Ill. App. 3d at 1005, 546 N.E.2d at 264.

Several courts have approvingly cited our suggestion that the trial court conduct a brief "*Cameron* hearing" when confronted with the State's intention to elicit evidence explaining the steps of a police investigation. See *People v. Shorty*, 408 Ill. App. 3d 504, 511, 946 N.E.2d 474, 481 (2011); *People v. Hunley*, 313 Ill. App. 3d 16, 35, 728 N.E.2d 1183, 1201 (2000); *People v. Warlick*, 302 Ill. App. 3d 595, 599, 707 N.E.2d 214, 218 (1998). Although the case before us did not involve police officer testimony, a hearing would have been no less appropriate to ensure that the State's need to explain its case to the jury would not trump defendant's right to be tried by competent evidence.

¶ 115    Defendant's failure to raise a formal objection to the testimony at issue did not prevent the trial court from *sua sponte* conducting a *Cameron* hearing in this case. At the section 115-10 hearing, which took place nearly two weeks before trial, Reardon testified that she decided to have a conversation with K.A. about good touches and bad touches based upon her conversation with Fernandez. Reardon specifically mentioned that Fernandez told her about defendant's "past." Such testimony should have raised red flags for the court. Even though defendant failed to raise this issue, the court should have *sua sponte* exercised its discretion to determine the appropriate extent to which the State may use such potentially prejudicial evidence in its case in chief.

¶ 116    We note that 25 years after *Cameron*, the State continues to commit error by introducing unduly prejudicial out-of-court statements for the purported purpose of explaining the steps of an investigation. In his special concurrence in *People v. Singletary*, 273 Ill. App. 3d 1076, 1089, 652 N.E.2d 1333, 1341-42 (1995), Justice Egan wrote the following:

> "Alas, our words, the words of *Cameron*, *Johnson*, and especially *Gacho* and *Jones*, have fallen on deaf prosecution ears. I confess to a feeling of personal frustration when today we must reverse an otherwise proper conviction because the State insists on introducing this improper evidence. What makes my feeling of frustration even stronger is that the improper evidence was unnecessary. Jurors are not fools. *** Unfortunately, the problem created by the introduction of this evidence persists; and I have the nagging suspicion that it persists because some prosecutors are ever confident that we will write off the error as harmless."

Justice Egan's words are as pertinent today as they were when he wrote them 19 years ago. And, as in *Singletary*, the improper evidence presented in this case was just as unnecessary.

¶ 117    We note that the State has failed, in case after case, to heed the advice of *Cameron* and appropriately limit the State's use of hearsay evidence to explain the steps of an investigation.

- 21 -

See, *e.g.*, *People v. McCoy*, 238 Ill. App. 3d 240, 248-49, 606 N.E.2d 245, 251 (1992) (a police officer's testimony that an informant named the defendant as a person who the "police were looking for" was inadmissible hearsay; the court found the error harmless); *People v. Cordero*, 244 Ill. App. 3d 390, 392-93, 613 N.E.2d 391, 394 (1993) (in a case involving possession of a stolen vehicle, a police dispatch stating that the vehicle was stolen was inadmissible hearsay in the absence of a limiting instruction; the court found the error harmless); *People v. Rodriguez*, 275 Ill. App. 3d 274, 281, 283, 655 N.E.2d 1022, 1027-28 (1995) (a detective's testimony that the defendant's brother told him he observed the defendant assaulting the murder victim on the day of the murder was inadmissible to show why the defendant confessed to the detective; the court found the error harmless); *People v. Davis*, 285 Ill. App. 3d 1039, 1043, 675 N.E.2d 194, 198 (1996) (a detective's testimony that an informant gave him the defendant's name was inadmissible to show the steps of the police investigation; the court found the error harmless); *Warlick*, 302 Ill. App. 3d at 601, 707 N.E.2d at 219 (in a burglary case, the admission of a "burglary in progress" police radio call was inadmissible hearsay not relevant to show the steps of the police investigation; the court found the error harmless); *People v. Sample*, 326 Ill. App. 3d 914, 924, 761 N.E.2d 1199, 1207 (2001) (in a murder trial, police officers' testimony that codefendants implicated the defendant in their statements to the police went beyond an explanation of police procedures and built the inference that the defendant was named by his criminal cohorts; the court found the error harmless); *People v. Rice*, 321 Ill. App. 3d 475, 484, 747 N.E.2d 1035, 1043 (2001) (a police officer's testimony that he and his partner received information from unidentified bystanders that the defendant was involved in the shooting was inadmissible hearsay; the court found no plain error); *People v. Mims*, 403 Ill. App. 3d 884, 897-98, 934 N.E.2d 666, 678-79 (2010) (a police officer's testimony about a sexual assault victim's statements was inadmissible to show the course of the officer's conduct; the court held that defense counsel's failure to object to such statements did not constitute ineffective assistance of counsel); *Shorty*, 408 Ill. App. 3d at 512, 946 N.E.2d at 482 (a police officer's testimony that a confidential informant told him the defendant would be purchasing heroin was inadmissible to show the steps of the police investigation; the court found the error harmless).

¶ 118    The State's repeated abuse of this limited exception to the hearsay rule–in the face of repeated condemnation from the appellate court–shows a disrespect for the fundamental purpose of the hearsay rule, which "is to test the real value of testimony by exposing the source of the assertion to cross-examination by the party against whom it is offered." *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963). The general prohibition against hearsay evidence is not some meaningless formality of our jurisprudence. Instead, it is " 'that most characteristic rule of the Anglo-American Law of Evidence–a rule which may be esteemed, next to jury trial, the greatest contribution of that eminently practical legal system to the world's methods of procedure.' " Cleary, *supra* § 244, at 724 (quoting 5 John H. Wigmore, Evidence § 1364, at 28 (Chadbourn rev. ed. 1974)). The State appears to have become comfortable allowing the exception to swallow the rule. To prevent that from happening, trial courts and courts of review should begin more closely scrutinizing (1) the State's purported need to offer hearsay statements to explain the steps of an investigation, as well as (2) the potential prejudice resulting from such evidence. In other words, the time is long overdue for trial courts to *routinely* be conducting "*Cameron* hearings."

¶ 119                    C. Cope's Opinion That K.A.'s Complaints Were Credible

¶ 120    Defendant next argues that Cope, who was allowed to testify as an expert, was not qualified to offer her opinion that K.A.'s complaints were credible. Defendant specifically challenges Cope's statement on redirect examination that K.A. gave her a "credible history." Defendant further contends that the State aggravated the error by commenting in closing argument as follows: "You heard Noelle Cope, who does this for a living, stated that it was [a] very credible statement. Noelle Cope certainly seemed to believe it." We agree that Cope's testimony and the State's commentary upon it were improper.

¶ 121    Because questions of credibility are to be resolved by the trier of fact (*People v. Kokoraleis*, 132 Ill. 2d 235, 264, 547 N.E.2d 202, 216 (1989)), "it is generally improper to ask one witness to comment directly on the credibility of another witness." *People v. Becker*, 239 Ill. 2d 215, 236, 940 N.E.2d 1131, 1143 (2010) (citing this court's decision in *People v. Henderson*, 394 Ill. App. 3d 747, 754, 915 N.E.2d 473, 478 (2009) ("[O]ne witness should not be allowed to express his opinion as to another witness's credibility.")).

¶ 122    The State argues that because Cope's comment on K.A.'s credibility was not responsive to the State's question, her testimony did not violate the rule from *Becker* that one witness should not be *asked* to comment directly on the credibility of another witness. However, the State was responsible for adequately preparing its witnesses to ensure that Cope did not *volunteer* improper and prejudicial testimony. See *People v. Rice*, 234 Ill. App. 3d 12, 19, 599 N.E.2d 1253, 1259 (1992) ("It is axiomatic that prosecutors have a certain amount of control over their witnesses; in the instant case, the State neglected to keep [the witness's] testimony within the bounds delineated by the court.").

¶ 123    Additionally, even if the State should not be blamed for Cope's improper comment on K.A.'s credibility, it adopted Cope's error as its own by specifically mentioning her positive assessment of K.A.'s credibility in closing argument. The prosecutor made the following statements immediately preceding his comments about Cope's credibility assessment:

    "Quite frankly, ladies and gentlemen, [K.A. is] too naïve to pull off this lie. To make it up, and give a pretty consistent statement throughout. Her lie apparently was so good that it fooled her mom, it fooled [Reardon], it fooled the police, it fooled Noelle Cope."

The prosecutor's argument was plainly intended to persuade the jury that it should defer to the State's witnesses in determining the credibility of K.A.'s claims, constituting a disregard for the well-settled principle that weighing the credibility of witnesses is within the exclusive province of the jury. See, *e.g.*, *People v. Collins*, 106 Ill. 2d 237, 261-62, 478 N.E.2d 267, 277 (1985).

¶ 124                    D. The Prosecutor's Personal Opinion on K.A.'s Credibility

¶ 125    Defendant's final contention is that the prosecutor improperly commented upon K.A.'s credibility during closing argument. Specifically, defendant challenges the following statements:

    "We can believe [K.A.] when she says that [defendant] put his privates on her woo woo.

    We can believe her when she says that [defendant] put his privates on her bottom, as in Count II.

    And we can believe her when she says that he put his mouth on her woo woo."

- 23 -

Defendant also challenges the following statements made in the prosecutor's rebuttal argument: "So, I do think [K.A.'s] statements are credible. They are believable. They are honest." Defendant argues that by using the terms "we" and "I," the prosecutor improperly "aligned himself with the jurors" and "informed the jury that he personally believed K.A." In response, the State contends that the prosecutor's statements at issue were not error, but fair comment on the evidence.

¶ 126    "Prosecutors are afforded wide latitude in closing argument." *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). However, "[i]t is prejudicial error for the prosecutor to express personal beliefs or opinions, or invoke the integrity of the State's Attorney's office, to vouch for the credibility of a prosecution witness." *People v. Lee*, 229 Ill. App. 3d 254, 260, 593 N.E.2d 800, 804 (1992). If no objection was made, a prosecutor's statements during closing argument will constitute plain error only if they were " 'so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process.' " *People v. Phillips*, 127 Ill. 2d 499, 524, 538 N.E.2d 500, 509 (1989) (quoting *People v. Albanese*, 104 Ill. 2d 504, 518, 473 N.E.2d 1246, 1251 (1984)). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *Wheeler*, 226 Ill. 2d at 122, 871 N.E.2d at 745. Whether a prosecutor's statements during closing argument warrant a new trial is a legal issue reviewed *de novo*. *Id*. at 121, 871 N.E.2d at 744.

¶ 127    We find the prosecutor's use of the term "we" no more expressive of his personal opinion than had he used the term "you" when speaking to the jury. However, in terms of whether the prosecutor invoked his own personal beliefs or opinions, "we can" is a far cry from "I do." We agree with defendant that the prosecutor improperly expressed his own opinion on K.A.'s credibility when he said to the jury, "I do think [K.A.'s] statements are credible."

¶ 128                              E. Plain Error
¶ 129                    1. *The Evidence Was Closely Balanced*
¶ 130    Having identified the errors in this case, we now turn to whether the evidence was "so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." *Herron*, 215 Ill. 2d at 178, 830 N.E.2d at 475.

¶ 131    The State's evidence consisted almost entirely of K.A.'s statements. In his interview with Seiler and his trial testimony, defendant outright denied K.A.'s accusations. Although the State presented four additional witnesses–Burwell, Reardon, Seiler, and Cope–to testify about what defendant did to K.A., those witnesses simply repeated what they heard from K.A. We hesitate to add weight to K.A.'s claims simply because they were repeated through the testimony of four other witnesses. Because neither K.A.'s statements nor defendant's testimony were "inherently incredible or severely self-contradictory" (*People v. Gray*, 406 Ill. App. 3d 466, 474, 941 N.E.2d 338, 345 (2010)), the evidence came down to a matter of credibility. Accordingly, we conclude that the evidence was closely balanced.

¶ 132                  2. *Errors Threatened To Tip the Scales of Justice*
¶ 133              a. Hearsay Revealing Past Accusations Against Defendant
¶ 134    In determining whether the State's improper evidence suggesting that defendant had been accused of sexual improprieties against young girls in the past threatened to tip the scales of

- 24 -

justice against defendant, we are mindful that evidence of other crimes is objectionable " 'not because it has no appreciable probative value, but because it has too much.' " *People v. Lehman*, 5 Ill. 2d 337, 342, 125 N.E.2d 506, 509 (1955) (quoting 1 John H. Wigmore, Evidence § 194 (3d ed. 1940)). Because recidivism is particularly well documented concerning sex offenders (*Donoho*, 204 Ill. 2d at 174, 788 N.E.2d at 717), the potential prejudice resulting from evidence suggesting that defendant committed other crimes of sexual abuse against young girls in the past is clear. Such evidence would likely be considered by the jury as persuasive evidence that defendant committed the charged offenses against K.A.

¶ 135 Further, the improper testimony about Reardon's conversation with Fernandez, and Burwell's conversation with Reardon, is especially troubling because the trial court never issued a limiting instruction. When the court admits an out-of-court statement for the limited purpose of explaining the steps of an investigation, "the court must specifically instruct the jury that the statement is introduced for a limited purpose and that the jury is not to accept the statement for the truth of its contents." *People v. Armstead*, 322 Ill. App. 3d 1, 12, 748 N.E.2d 691, 701 (2001); see also *Simms*, 143 Ill. 2d at 174, 572 N.E.2d at 955. Although the State purports to have offered the testimony for the limited purpose of explaining the course of Reardon and Burwell's conduct, the jury was never instructed to limit its consideration of the evidence accordingly. We see no reason why the average juror would *not* consider the testimony as evidence of defendant's guilt, particularly when the testimony seemingly implicated defendant in similar past conduct. See *People v. Trotter*, 254 Ill. App. 3d 514, 527-28, 626 N.E.2d 1104, 1113 (1993) ("If such testimony is presented, however, the trial court must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act and that they were not to accept the statement as true. [Citation.] No such instruction was given in this trial. Thus, it cannot be presumed that the jury's use of the evidence was limited to non-hearsay purposes.").

¶ 136 b. Bolstering of K.A.'s Credibility

¶ 137 Cope, a highly experienced, award-winning professional in the field of child sex abuse investigation, found K.A.'s claims credible. In his closing argument to the jury, the prosecutor pointed out that he, Cope, Burwell, Reardon, and Seiler all believed K.A.'s accusations against defendant.

¶ 138 Because this case was truly a matter of credibility–that is, K.A.'s word against defendant's word–the improper evidence and argument bolstering K.A.'s credibility was particularly prejudicial. Although the prosecutor's improper expression of his personal opinion was of little significance in the overall context of his closing argument, the impact of Cope's improper comment on K.A.'s credibility should not be underestimated. The State endorsed Cope's improper comment by arguing in closing that Cope, "who does this for a living," found K.A.'s statement "very" credible. (We note that in her testimony, Cope never used the word "very.") The State also argues that because Cope's comment was "fleeting," it could not have materially influenced the jury. Again, even if Cope's improper comment was "fleeting" when it came out during her testimony, the State deliberately reinforced that comment by directing the jury's attention to it in closing argument. The prejudice resulting from Cope's improper comment was aggravated by the prosecutor's decision to emphasize the importance of Cope's credibility determination and argue it to the jury as substantive evidence. Given Cope's

extensive experience interviewing child victims of sexual abuse, the jury could understandably be expected to assign great weight to her positive assessment of K.A.'s credibility.

¶ 139 Although defendant does not mention this point in his brief, our review of the record reveals that the trial court failed to instruct the jury as required by section 115-10(c) of the Code, which provides as follows:

"If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115-10(c) (West 2012).

Because the court admitted K.A.'s statements under section 115-10 of the Code, "sending the case to the jury without such an instruction was a clear and obvious error." *People v. Sargent*, 239 Ill. 2d 166, 190, 940 N.E.2d 1045, 1059 (2010). The State's improper evidence and argument bolstering K.A.'s credibility is troubling, given the absence of this instruction, which the legislature deemed a necessary safeguard when a child's hearsay statements are admitted under section 115-10 of the Code. The supreme court has held that failure to give the instruction required by section 115-10(c) of the Code constitutes plain error if the evidence is closely balanced. *People v. Mitchell*, 155 Ill. 2d 344, 354, 614 N.E.2d 1213, 1217 (1993). However, given defendant's failure to argue this specific error on appeal, we treat the court's failure to properly instruct the jury merely as a factor aggravating the prejudice caused by the State's improper evidence and argument relating to K.A.'s credibility.

¶ 140 c. Defendant's Alternating Abuse of K.A. and A.W.
During the Game of Hide-and-Seek

¶ 141 K.A. told Cope that on one occasion, defendant abused A.W. before and after abusing her, essentially swapping the girls in and out of the bedroom. In her statements to Burwell, Reardon, and Seiler, K.A. never mentioned that defendant abused her on the same occasion that he abused A.W.

¶ 142 For whatever reason, the State elected to present K.A.'s statements to Cope through section 115-13 of the Code exclusively, rather than including those statements in the State's motion *in limine* pursuant to section 115-10 of the Code. Despite the State's failure to include K.A.'s statements to Cope in the State's motion *in limine*, the State nevertheless elicited Cope's testimony about defendant's apparent abuse of A.W., which it should have known was in no way pertinent to medical diagnosis or treatment of K.A. Cope testified that defendant brought K.A. into the bedroom and sexually abused her *after* being in the bedroom with A.W., then defendant brought A.W. back into the bedroom after sexually abusing K.A. However, whereas K.A.'s *properly* admitted statements recounted only what she saw and heard from outside the bedroom during the incident involving A.W., Cope's improper testimony apparently revealed what was happening inside the bedroom on that evening. Moreover, the image of defendant alternating his sexual abuse between K.A. and A.W. over the course of an evening added an additional layer of depravity to his conduct. This evidence–assuming the jury believed it–was very probative of defendant's guilt. However, because the State failed to include K.A.'s statements to Cope in the State's motion *in limine*, those statements remained inadmissible

hearsay, meaning that their admission must be added to defendant's side of the scale under our plain-error analysis.

¶ 143                                    III. CONCLUSION

¶ 144        Based upon our thorough review of the trial record, we conclude that defendant has met his burden of establishing plain error. The cumulative errors in this case, including the erroneous admission of prejudicial evidence and the State's improper argument based thereon, threatened to tip the scales of justice against defendant. For the foregoing reasons, we reverse defendant's convictions and remand for a new trial. Because the State presented sufficient evidence to sustain defendant's convictions, double jeopardy does not bar a retrial. See *People v. Ward*, 2011 IL 108690, ¶ 50, 952 N.E.2d 601.

¶ 145        Reversed and remanded.