Sixth Division
August 20, 2010

No. 1-08-2460

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | of Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 03 CR 3883 |
| | ) | |
| WILLIAM MIMS, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Marjorie Laws, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the opinion of the court:

Following a jury trial, defendant William Mims was found guilty of aggravated criminal sexual assault, aggravated kidnaping and aggravated robbery for the November 2002 attack of T.A. Subsequently, the trial court sentenced defendant to natural life as a habitual criminal based on previous convictions.

Defendant appeals, arguing that his trial counsel was ineffective for: (1) failing to request that the jury be instructed on the defense of consent; and (2) failing to object to hearsay testimony of a police officer which retold the victim's account of the attack.

The following evidence was presented at defendant's January 2008 jury trial.

T.A. testified that on November 21, 2002, she was 17 years old and a senior at Dunbar Vocational Career Academy. She lived on the 5800 block of South King Drive in Chicago. She woke up early to get ready for school. She left to catch the King Drive bus between 6:15 to 6:30 a.m., but she missed the bus. T.A. then walked to 59th and State Street to get a different bus. She tried to stop in a liquor store to get change, but the store was closed. She stated that the

traffic was light at that early time and she was standing alone at the bus stop.

While T.A. was waiting for the bus, she saw a white truck drive by, make a U-turn and park across the street from where she was standing. A man exited the vehicle and walked toward her. T.A. identified this man as defendant. She thought defendant was going to open the liquor store. T.A. testified that she did not know defendant and this was the first time she had seen him. Defendant approached T.A., put his arm through her arm, and pressed a gun to her side. She testified that defendant said, "b----, get in the truck." They walked across the street, arm in arm. As they passed the truck, T.A. looked at the license plate and memorized it, 353 1322. Defendant opened the passenger door and pulled her into the truck.

T.A. stated that defendant drove around the Kennedy-King College area. He kept the gun in his left hand. While defendant was driving, T.A. sat with her back toward the window and tried to unlock the passenger door, but she was unable to do so. Defendant asked for T.A.'s purse, which she gave him. He removed her identification and read her information aloud. T.A. testified that it seemed like she was in defendant's truck for "about four, five hours."

Eventually, defendant pulled into an alley near 67th and Perry and then backed into a lot. Defendant told T.A. to give him her jewelry, including her bracelets, earrings, and a chain. She removed the jewelry and gave it to him. Defendant then moved the passenger seat down and told her to take off her shoes. She did and defendant threw them out the window and into the alley. Defendant started to take off her pants. He unbuttoned her belt, removed her pants and underwear, and threw them into the alley as well.

T.A. testified that defendant climbed over her. She stated that "[h]e took his penis out and he told [her] to put it inside [her]." She asked him to use a condom and he told her to "shut

2

the f--- up." T.A. did as he said and put his penis in her vagina. Defendant told her to look out the window and he placed the gun against her left cheek. After two minutes, defendant ejaculated inside her and wiped himself off with a towel.

Defendant started the truck, drove to the end of the alley and told T.A. to get out of his vehicle. She got out and looked at defendant's license plate again before defendant drove away. She then walked down the alley to retrieve her clothes from the wet ground and put them on. A few minutes later, a couple in a car stopped to see if she was okay. She was crying at that time. The couple drove her home. When T.A. arrived home, she told her mother and aunt what happened. Her aunt called the police. The police arrived a short time later. T.A. stated that she told the officer what happened and gave her the license plate number from defendant's truck. The officer took T.A. to the place where the sexual assault occurred and then took her to Provident Hospital. T.A. admitted on cross-examination that she suffered no physical injuries during the attack.

A few days later, a detective came to her house and showed her a several photographs. She selected one of the photographs as the person who assaulted her. Then, in January 2003, T.A. went to Area One to view a lineup. During the lineup, she identified defendant as the person who assaulted her.

Officer Brenda Hayes testified that she is a police officer with the Chicago police department. She received a dispatch shortly before 9 a.m. on November 21, 2002, to assist a rape victim at the 5800 block of South King Drive. Officer Hayes was working in uniform and without a partner. She proceeded to that location and met with T.A. and her mother. T.A. appeared "very distraught, agitated" to Officer Hayes.

During the prosecutor's direct examination, Officer Hayes testified about what T.A. told her had occurred. Officer Hayes' testimony essentially recounted T.A.'s description of what happened. The trial court called the attorneys over for a sidebar conference and raised a *sua sponte* objection to this testimony as inadmissible hearsay. The prosecutor contended that the testimony was admissible as an excited utterance, but the court disagreed. Defense counsel stated that he did not object because the testimony assisted his defense strategy "to make clear to these jurors that no matter what the police officers say in this trial, it's only based on what this young woman said to them." The court concluded that the testimony was inadmissible hearsay and instructed the jury that it could consider Officer Hayes' testimony about how T.A. appeared to her, but may not consider any conversations as to what T.A. told the officer.

Officer Hayes also testified that T.A. said defendant was driving a white Mitsubishi Montero and gave Officer Hayes the license plate number. She took T.A. to the location of the crime and then to Provident Hospital.

Detective Samuel Brown testified that he is a detective with the violent crimes section of the Chicago police department. Detective Brown stated that he conducted the lineup in which T.A. identified defendant as the man who sexually assaulted her. He also located defendant's white Mitsubishi truck with license plate 353 1322 from an "impound" lot.

The parties stipulated that Dr. Michael Lamonto would testify that he examined T.A. on November 21, 2002. She told Dr. Lamonto that she had been a victim of a sexual assault. He took a vaginal sample from T.A., which was included in an evidence collection kit along with T.A.'s underwear and a panty liner and turned over the kit to the Chicago police department. He noted no acute injuries or bleeding, but that in his professional opinion "not all forcible sexual

4

assaults result in medical findings of injury."

The next several stipulations related to DNA analysis. Melissa Thompson would testify that she extracted a male DNA sample from semen found on T.A.'s underwear. Donald Parker would testify that he received a buccal sample from defendant and performed a DNA analysis on that sample. Karen Abbinanti would testify that she compared the male DNA sample from the semen stain in T.A.'s underwear to defendant's DNA profile and found that these two profiles matched.

N.B. testified that on March 6, 2002, she was 19 years old. On that day in the early evening, she was leaving her boyfriend's house near 79th and Greenwood in Chicago. She was on her way home. She went to catch the METRA train, but had missed it. She decided to return to her boyfriend's house. When she came down from the platform, she was approached by defendant, whom she identified in court. She testified that he "grabbed" her, told her to come with him and if she made any noise or screamed, he would kill her.

Defendant took N.B. to his car. She described the car as a silver, "maybe SUV type," Toyota. She got the license plate, but could not remember because it had been six years since the assault. She did recall that the vehicle had temporary plates. Defendant put her in the passenger seat and said if she screamed or fought, he would kill her. Defendant got in the car and drove to an alley off of Greenwood.

N.B. testified that defendant grabbed her by the neck and told her to take one leg out of her pants. She was in the passenger seat and defendant was in the driver seat. He had one hand behind the seat and she believed he had "some form of weapon." Defendant climbed over and told her to put his penis in her vagina. N.B. complied. Defendant told her "to moan and act like

5

[she] liked it." While this happened, one of defendant's hands was around her neck and the other was behind the seat. When defendant finished, he told her to get dressed and drove her back to 79th Street. He told her to get out of the car.

After the assault, N.B. went to the hospital and spoke with police. Later, she viewed a lineup and identified defendant as the person who sexually assaulted her. N.B. denied knowing T.A. prior to coming to court.

On cross-examination, defendant's attorney impeached N.B. about the type of car she initially told police defendant drove, a white Jeep Cherokee.

The State also entered into evidence a certified copy of vehicle records from the Illinois Secretary of State indicating that a 2002 Mitsubishi with the license plate 353 1322 was registered to defendant. The State then rested.

Michael Slevnick testified for defendant. He stated that he is a private investigator. He was hired by defense counsel to perform traffic counts at the intersection of 59th Street and State Street. He testified that on Thursday, November 1, 2007, between 8 and 8:30 a.m., he observed 301 vehicles at the intersection. On Thursday, November 8, 2007, at the same time and location, he observed 284 cars. He repeated this count on Thursday, November 15, 2007, and Thursday, November 29, 2007, between 6 and 7 a.m., and observed 400 and 374 vehicles, respectively.

Defendant then testified on his own behalf. He stated that he met T.A. on the Saturday before November 21, 2002. He said he was driving on 59th Street when he saw T.A. walking down the street "looking for some action." They both stopped and started flirting. He gave T.A. his cell phone number.

On November 21, 2002, T.A. called defendant's cell phone early in the morning and

6

asked him to pick her up at the corner of 59th and State. When defendant arrived at that location, T.A. got in his car. Defendant testified that T.A. wanted $50 for gym shoes and agreed to "quickie sex." Defendant said T.A. also told him she "smoked weed" and she knew where to get some good marijuana. She asked him to drive her to the "weed spot so she can get her some weed."

T.A. directed him to 67th and Perry. T.A. asked defendant for all the money up front, but he refused and gave her $10 for marijuana. Defendant did not want her to "run off" with his money so he "told her to take care of [him] before" she left. Defendant denied restraining T.A. and denied having or owning a firearm. Defendant testified that they engaged in vaginal and anal sex in his truck for five minutes. After they finished, T.A. got out of the car to go buy the marijuana. Defendant said he "breached" their agreement and drove off without giving her the remaining $50. Defendant stated that she called him approximately 10 to 15 minutes later and asked for her $50, but he hung up on her and refused to answer her subsequent phone calls.

Defense counsel offered a stipulation that Chicago police officer C. Castillo would testify that N.B. indicated that the person who attacked her was driving a white Jeep Cherokee. The defense then rested.

In rebuttal, the State recalled Detective Brown. He testified that he interviewed defendant on January 27, 2003. He stated that defendant told him that he was at work at 6:30 a.m. on November 21, 2002. The State also called Assistant State Attorney (ASA) Tene McCoy Cummings. ASA Cummings interviewed defendant on January 27, 2003, she stated that defendant never told her that he had consensual sex with T.A. on November 21, 2002. The State rested in rebuttal.

7

Following deliberations, the jury found defendant guilty of aggravated criminal sexual assault, aggravated kidnaping and armed robbery. At the subsequent sentencing hearing, the trial court heard testimony about a series of sexual assaults that occurred between 1998 and 2002 by defendant. A Chicago police officer testified about her investigation of these five sexual assaults. Based on defendant's two prior Class X convictions for armed robbery and the present convictions, the trial court sentenced defendant to natural life in prison as a habitual criminal.

This appeal followed.

On appeal, defendant raises two claims of ineffective assistance of trial counsel. Specifically, he argues that his counsel was ineffective for failing to request a jury instruction on the defense of consent and for failing to object to Officer Hayes' hearsay testimony.

Claims of ineffective assistance of trial counsel are resolved under the standard set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In Strickland, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under Strickland, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To demonstrate performance deficiency, a defendant must establish that counsel's performance was below an objective standard of reasonableness. People v. Edwards, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 80

1-08-2460

L. Ed. 2d at 698, 104 S. Ct. at 2068. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. This determination must be made on the basis of the entire record, not isolated instances. People v. Kluppelberg, 257 Ill. App. 3d 516, 526 (1993). Effective assistance of counsel refers to competent, not perfect, representation. People v. Palmer, 162 Ill. 2d 465, 476 (1994).

In order to prove ineffective assistance of counsel, defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. People v. Giles, 209 Ill. App. 3d 265, 269 (1991). Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent. People v. Young, 341 Ill. App. 3d 379, 383 (2003). A decision that involves a matter of trial strategy will typically not support a claim of ineffective representation. People v. Simmons, 342 Ill. App. 3d 185, 191 (2003). "Defense counsel's choice of jury instruction is considered a tactical decision, within the discretion of defense counsel." People v. Bobo, 375 Ill. App. 3d 966, 977 (2007).

First, defendant contends that his attorney was ineffective for failing to request the jury instruction on the defense of consent. Defendant asserts that the consent instruction was necessary and without it, the jury was given no legal basis on which to acquit him. The State maintains that defense counsel made a tactical decision not to instruct the jury on the defense of consent because the instruction was not needed to acquit defendant and the language of the consent definition was potentially harmful to defendant's case.

Illinois Pattern Jury Instructions, Criminal, No. 11.63 (4th ed. 2000) (hereinafter IPI

9

Criminal 4th No. 11.63) states: "It is a defense to the charge of _____ that _____ consented." IPI Criminal 4th No. 11.63. The Committee Note to IPI Criminal 4th No. 11.63 advises the court that the definition of consent, IPI Criminal 4th No. 11.63A, is also to be given. IPI Criminal 4th No. 11.63A defines consent as follows.

"The word 'consent' means a freely given agreement to the act of [ (sexual penetration) (sexual conduct) ] in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the defendant [or the victim's manner of dress] shall not constitute consent."

Prior to jury deliberations, the following discussion took place outside the presence of the jury concerning the consent instruction.

"THE COURT: 11.63, the defense of consent. Saying give instruction 11.63A defining the word.

ASA WELKIE: Have to give both. We used the word in argument, so I believe it's covered. Also proof of other crimes, that's what jogged my memory of it. When we were arguing.

MR. WARD [defendant's attorney]: I'm not asking for the instruction myself.

ASA MILLEVILLE: Have you discussed that with your client?

MR. WARD: No I haven't. Maybe I will.

THE COURT: Mr. Ward?

MR. WARD: Judge, I did have a side conversation with Mr. Mims. We are not asking for the instruction. Given the way this case has gone, played out, we don't believe — we don't believe helps our case, so we are not asking for it. If the court chooses to put it in, I understand that.

THE COURT: When I look at 11.63, it does have a defense of consent. But you have to give 11.63A defining the word for consent. Is that the reason you're not asking for it?

MR. WARD: That's the reason, yes.

THE COURT: Yes.

ASA WELKIE: Just wanted to cover that.

THE COURT: All right then. Because it appears the further definition would actually assist the [S]tate. The last sentence, lack of verbal or physical resistance or submission which the victim resulting from the use of force or threat of force by the defendant. Shall not constitute consent. [*sic*] So this would appear to be a [S]tate instruction. And you didn't ask for it.

Mr. Mims, have you discussed with your attorney about not sending back an instruction concerning defense of consent?

THE DEFENDANT: Yes.

THE COURT: He's indicated to you that he chose not to ask for that instruction?

11

THE DEFENDANT: Yes.

THE COURT: Do you agree with him?

THE DEFENDANT: Yes I do.

THE COURT: All right. I'm not at this time *sua sponte* going to send that instruction back because it appears that the definition has to go along with it. Pursuant to the IPI. And again that appears 11.63A would have been a state's instruction and they did not ask for it."

Here, the evidence against defendant was substantial. The State had DNA evidence linking defendant to T.A. T.A. testified that she was on her way to school when defendant approached her, pointed a gun at her, forced her into his vehicle, and then robbed and sexually assaulted her. T.A. memorized defendant's license plate number. She was seen crying and given a ride home by strangers. She immediately reported to her mother and aunt that she had been sexually assaulted. The police were notified and T.A. reported what occurred. She gave them defendant's license plate number, which the State showed was on a vehicle registered to defendant. T.A. went to the hospital for an examination and a rape kit was taken. T.A. later identified defendant in a lineup. The State also presented the testimony of N.B. She testified that defendant approached her on the street, forced her into his vehicle and sexually assaulted her.

Defense counsel presented a theory of consent as a defense. The DNA evidence prevented a denial by defendant, but the medical evidence had shown that T.A. had not suffered any physical injuries. Defense counsel asserted in opening statements and closing arguments that

12

no one knew what happened other than T.A. and defendant. Defendant testified that he met T.A. on the street the weekend prior November 21, 2002, and she called him that morning to arrange their meeting. He picked her up and she agreed to have sexual intercourse with him for $50 because she wanted new athletic shoes. After driving to a location for her to purchase marijuana, they engaged in sexual intercourse and then he drove off without her and did not pay the agreed $50. Defense counsel also presented evidence of a private investigation showing the heavy traffic patterns at the intersection of 59th and State, to contrast T.A.'s testimony that the intersection was not busy. Defense counsel used the State's evidence in his favor by highlighting that T.A. did not suffer physical injuries and showing that the intersection was usually busy at that time of the day, in addition to defendant's own testimony detailing consensual sexual intercourse.

In light of this theory, defense counsel specifically chose as a matter of trial strategy not to instruct the jury on the defense of consent. His reasoning was that he did not want the second sentence of the definition presented to the jury as it undermined his defense. We note that IPI Criminal 4th No. 11.63 requires the definition instruction, No. 11.63A, to be given together. The second sentence of IPI Criminal 4th No. 11.63A states: "Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the defendant shall not constitute consent." T.A. testified that she did not fight defendant to prevent him from sexually assaulting her. The second sentence of the definition instruction informed the jury that defendant could still be guilty of aggravated criminal sexual assault even though T.A. did not physically resist defendant. It was a reasonable tactical decision by defense counsel not to instruct the jury on this point. Defense counsel's strategy in this case was reasonable given the

1-08-2460

State's evidence and we decline to find such performance to be deficient in hindsight.

Defendant asserts that he has demonstrated prejudice under Strickland because the decision by his attorney not to instruct the jury on consent deprived him of a fair trial. Defendant contends the jury had no legal basis to acquit him without the consent instruction. We disagree.

A person commits aggravated criminal sexual assault if he "commits an act of sexual penetration by the use of force or threat of force" and is armed with a firearm. 720 ILCS 5/12-13(a)(1), 12-14(a)(8) (West 2002). In People v. Haywood, the supreme court discussed consent and force.

> "In common understanding, if it is said that one was forced to
>
> perform an act, it follows that the person's act was nonconsensual;
>
> and if one freely consents to the performance of an act upon
>
> oneself, clearly that person has not been forced. Thus, although the
>
> prosecution is not required to prove nonconsent formally, it is
>
> obvious that if the prosecution shows that there was an act of
>
> sexual penetration by force, that evidence demonstrates that the act
>
> was nonconsensual. To prove the element of force is implicitly to
>
> show nonconsent. Too, if force is established it would be
>
> redundant to require a separate showing of nonconsent as part of
>
> the prosecution's case in chief. Thus, consent is made a defense to
>
> be raised by the accused to rebut evidence of force presented by the
>
> State." People v. Haywood, 118 Ill. 2d 263, 274 (1987).

Defendant cites People v. Coleman, 166 Ill. App. 3d 242 (1987), to support his assertion

14

that failure to give a consent instruction deprived him of a fair trial. However, the issue of consent was reviewed for plain error in Coleman, not ineffective assistance. In Coleman, the reviewing court concluded that the defendant was entitled to a new trial because the jury was not instructed that it was the State's burden to prove a lack of consent. Coleman, 166 Ill. App. 3d at 248. We point out that the opposite conclusion was reached in People v. Roberts, 182 Ill. App. 3d 313 (1989). In that case, the appellate court disagreed with Coleman and found that the jury was adequately instructed on the law and "the jury was allowed to weigh 'force' evidence against 'consent' evidence to determine whether force or threat of force was present." Roberts, 182 Ill. App. 3d at 318. The Roberts court further held that even if it was error to omit the consent instruction, any error would be harmless because "[t]he trial court instructed the jury on the elements of aggravated criminal sexual assault, and on the defense of consent, the presumption of innocence, and the State's burden." Roberts, 182 Ill. App. 3d at 319. Nevertheless, neither of these cases considered whether the decision not to instruct the jury on the consent defense amounted to ineffective assistance of counsel, the question in this case.

In this case, the State was required to prove that defendant forced an act of sexual penetration upon T.A. while armed with a firearm. T.A.'s testimony was that defendant approached her on the street with a gun, took her to his vehicle, drove around and ordered her to have sexual intercourse with him. She memorized the license plate of defendant's car and immediately reported the sexual assault to the police. In contrast, defendant testified that he had previously met T.A. and he met her for a prearranged date. She willingly got in his vehicle and agreed to "quickie sex" in exchange for $50, but he drove away without giving her the money. "It is the function of the trier of fact to assess the credibility of the witnesses, to determine the

15

appropriate weight of the testimony, and to resolve conflicts or inconsistencies in the evidence." People v. Evans, 209 Ill. 2d 194, 211 (2004). The jury as the trier of fact could have rejected T.A.'s testimony and found defendant's version of the events to be more credible. Contrary to defendant's argument, the jury did not need the consent instruction to find defendant not guilty, because if the jury believed defendant, then the State failed to prove force by a firearm, a necessary element of the offense.

Specifically, the trial court instructed the jury that the State must prove three things: (1) an act of sexual penetration; (2) the act was committed by the use of force or threat of force; and (3) the defendant used a dangerous weapon. The court also told the jurors that if they find that "any one of these propositions has not been proved beyond a reasonable doubt," then they should find defendant not guilty. Thus, if the jury had found defendant credible and concluded that he did not use or threaten force on T.A. to have sexual intercourse, then it could have found him not guilty.

Further, even if defense counsel's decision not to instruct the jury on consent was unreasonable, defendant cannot establish how the result of the trial would have been different if the jury had received the consent instruction. As we discussed, the jury heard two different accounts of the incident from T.A. and defendant. However, the State also presented the testimony of N.B., who identified defendant as the man who kidnaped her from the street and sexually assaulted her. Defendant attempts to minimize N.B.'s testimony because she was inconsistent on the make and model of her attacker's vehicle. This detail does not negate her in-court identification of defendant as the man who attacked her. Additionally, the State presented Detective Brown and ASA Cummings in rebuttal and each testified that defendant never asserted

16

that he had consensual sexual intercourse with T.A. Based on all this evidence, the State sufficiently proved each element of aggravated criminal sexual assault beyond a reasonable doubt. The consent instruction would not have changed the outcome of defendant's trial where the jury had the opportunity to find defendant not guilty if it had found his testimony to be credible. Accordingly, defendant's claim of ineffective assistance of trial counsel fails.

Next, defendant asserts that his trial counsel was ineffective for failing to object to the hearsay testimony of Officer Hayes. The State responds that this was deliberate trial strategy and subject to deferential consideration.

Officer Hayes testified as follows.

"ASA MILLEVILLE: What did she tell you had happened to her?

OFFICER HAYES: That she had missed her bus on 59th and King Drive. And that she had walked to 59th and State Street to wait for the bus.

ASA MILLEVILLE: Did she tell you if anything happened to her at 59th and State Street?

OFFICER HAYES: Yes. While she was waiting for the bus, she saw a vehicle westbound on 59th Street do a U-turn and park northbound on State.

ASA MILLEVILLE: Did she tell you what happened next?

OFFICER HAYES: Yes, she said that a male exited the vehicle, approached her, put a gun in her side and told her to come

17

with him.  He then took her and pulled her into his vehicle.

ASA MILLEVILLE: Did she tell you what happened next?

OFFICER HAYES: He drove her to an alley on 67th and Perry.

ASA MILLEVILLE: Did she tell you what happened at that alley?

OFFICER HAYES: Yes.  She said he made her take off her shoes, her socks, her pants, and her panties.  And he forcibly placed his penis into her vagina and upon ejaculation, he then robbed her, he took a, some gold hoop earrings, a bracelet, a gold bracelet shaped like X's and O's.  And an 18 inch gold chain with a cross on it from her neck."

At that time, the trial court called a sidebar.  The court inquired what hearsay exception this testimony fell under and the State contended it was an excited utterance.  The court disagreed.  Defense counsel stated that he did not object because "they were opening the door for [him]."  Then, the following colloquy occurred between the parties and the court.

"THE COURT: Mr. Ward, you indicated that you let it in because it opened up the door for you.  What kind of door you talking about?

MR. WARD: Following my remarks in my opening statement, what I want to make sure clear to these jurors is that no matter what the police officers say in this trial, it's only based on

18

what this young woman said to them. I certainly don't — I certainly don't think this was an excited utterance. I don't think it's an exception. But.

THE COURT: It's hearsay and the court to preserve the record can *sua sponte* make its own objection. It certainly doesn't go to what the officer did after she talked to the victim at that point it time. So I'm going to direct the jurors to disregard any statements that the victim made to the officer because it's hearsay. It's just bolstering her testimony already. I'm going to tell them because it's hearsay."

In front of the jury, the trial court instructed:

"Ladies and gentlemen, you may consider as evidence what this witness has testified about how the victim appeared to her. But at this point in time, any conversations as far as what the victim told this officer, I'm going to strike. You may not consider it because I found that it's hearsay."

Defendant argues that his trial counsel's failure to object to the hearsay testimony was "nonsensical and certainly not sound trial strategy." He contends that this testimony bolstered T.A.'s own testimony and did not assist the defense strategy that T.A. consented to the sexual encounter. Further, despite the fact that the trial court struck this testimony and instructed the jury to disregard any conversations about what T.A. told Officer Hayes, defendant asserts that he was prejudiced because "the damage had been done" and T.A.'s testimony had been

19

corroborated. Defendant states that "[t]he proverbial bell had been rung and the trial court's attempt to un-ring it was not sufficient to correct the error." The State maintains that defense counsel did not object as part of his trial strategy to reinforce his opening statement that no one knew what happened besides T.A. and defendant. The State also responds that defendant did not suffer any prejudice because the hearsay testimony was struck by the trial court and the jury was instructed to disregard it.

The hearsay rule generally prohibits the introduction of an out-of-court statement used to prove the truth of the matter asserted. People v. Spicer, 379 Ill. App. 3d 441, 449 (2007). "Generally, 'a witness may not testify regarding an out-of-court statement made by the witness or a third person which corroborates the witness' or third person's testimony at trial.' " People v. Graham, 206 Ill. 2d 465, 478 (2003), quoting People v. Beals, 162 Ill. 2d 497, 507 (1994). "To establish [her] course of conduct, a police officer may testify that [she] had a conversation with an individual and that [she] subsequently acted on the information received." People v. Johnson, 199 Ill. App. 3d 577, 582 (1990). "However, the officer cannot testify as to the substance of [her] conversation with the individual because that would be inadmissible hearsay." Johnson, 199 Ill. App. 3d at 582.

Here, Officer Hayes' testimony about what T.A. told her occurred was inadmissible hearsay and properly struck by the trial court. The court instructed the jury at that time and again before deliberations to disregard testimony that had been stricken. "Generally, the prompt sustaining of an objection by a trial judge is sufficient to cure any error in a question or answer before the jury." People v. Ross, 303 Ill. App. 3d 966, 983 (1999); see also People v. Alvine, 173 Ill. 2d 273, 295 (1996); People v. Redd, 173 Ill. 2d 1, 29 (1996); People v. Hobley, 159 Ill.

20

2d 272, 316 (1994). Moreover, the jury is presumed to follow the instructions given to it by the trial court. People v. Taylor, 166 Ill. 2d 414, 438 (1995); People v. Biggs, 294 Ill. App. 3d 1046, 1051 (1998).

Defendant has not argued how the trial court's prompt action to strike Officer Hayes' testimony and instruct the jury to disregard it failed to cure any error. Defendant merely asserts that this was insufficient to "un-ring" the bell. The only case cited by defendant concerned a witness reference to a polygraph examination after the Illinois Supreme Court has condemned any reference to a polygraph examination at trial. See People v. Lewis, 269 Ill. App. 3d 523 (1995). Here, the jury had already heard T.A.'s story so it was not receiving new information, and the trial court acted to correct the error by striking the testimony and instructing the jury more than once to disregard it. The trial court's action cured any error and defendant did not suffer any prejudice.

Further, defense counsel's trial strategy was that only T.A. and defendant knew what happened and everyone else was just repeating another's version of events. In his opening statement, defense counsel emphasized that no one knows what happens behind closed doors except those present, T.A. and defendant. He told the jury they would hear testimony from police officers, laboratory workers and others, but they were not present when the events occurred. During closing arguments, defense counsel returned to this theme by arguing that T.A. and defendant told the jurors about the circumstances of that day, but any other witness was only telling the jury what T.A. or defendant said happened. Based on this strategy, defendant's attorney explained that he did not object to Officer Hayes' testimony because it reiterated his arguments that no one else knew what happened beyond T.A. and defendant. He wanted to have

21

the jury focus on T.A.'s testimony to prove the State's case. "Defense counsel's failure to object to trial testimony may be a matter of strategy and does not necessarily establish substandard performance." Graham, 206 Ill. 2d at 478-79. As we previously stated, a decision that involves a matter of trial strategy will typically not support a claim of ineffective representation. People v. Simmons, 342 Ill. App. 3d 185, 191 (2003). Defense counsel explained on the record that he did not object based on his trial strategy, which was emphasized in his opening statements and closing arguments. Thus, we cannot say that defense counsel's performance was deficient when he chose not to object as part of his trial strategy

Finally, defendant makes a brief assertion that the cumulative effect of these alleged errors by his trial counsel rendered the conviction unreliable. We disagree. As previously discussed, defendant cannot show that the result of the trial would have been different but for his attorney's alleged errors. Moreover, both alleged errors were reasonable tactical decisions made by defense counsel as part of his trial strategy. Accordingly, we find no cumulative error.

Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

CAHILL, P.J., and J. GORDON, J., concur.