# Illinois Official Reports

## Appellate Court

*People v. Torres*, 2015 IL App (1st) 120807

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PABLO TORRES, Defendant-Appellant. |
| District & No. | First District, Third Division <br> Docket No. 1-12-0807 |
| Filed | May 27, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-107; the Hon. Evelyn B. Clay, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Carson R. Griffis, both of State Appellate Defender's Office, of Chicago, for appellant. <br><br> Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant Pablo Torres was charged by indictment with attempted murder (720 ILCS 5/8-4(a), 9-1 (West 2008)); four counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2), 12-14(a)(3), 12-14(a)(4) (West 2008)); and aggravated kidnapping (720 ILCS 5/10-2(a)(3) (West 2008)). The charges stemmed from events that occurred between November 25 and 27, 2009, at a motel in Chicago. A jury found Torres not guilty of attempted murder but convicted him of aggravated battery as a lesser-included offense of attempted murder, four counts of aggravated criminal sexual assault, and one count of aggravated kidnapping. The trial court merged the four counts of aggravated criminal sexual assault and sentenced Torres to concurrent terms of 21 years in prison for aggravated criminal sexual assault and 6 years for aggravated kidnapping, with a consecutive 6-year term for aggravated battery.

¶ 2 Torres argues three grounds for reversing his convictions and remanding for a new trial: (1) the trial court improperly allowed testimony regarding two prior acts of domestic violence by Torres against Maria P.; (2) the State inadequately summarized, as required by statute (725 ILCS 5/115-7.4(c) (West 2012)), a prior act of domestic violence; and (3) the trial court erred when it failed to instruct the jury as to the State's burden of proving lack of consent beyond a reasonable doubt.

¶ 3 We affirm Torres' convictions and sentences. First, the trial court properly allowed the State to adduce evidence of two earlier attacks by Torres against Maria that occurred within two months of the charges. Second, the State's supplemental motion to allow the other-crimes evidence provided an adequate summary of the evidence as required by statute. 725 ILCS 5/115-7.4(c) (West 2008). Third, Torres neither tendered an instruction regarding his consent defense during the conference nor did he raise the issue in his motion for a new trial; thus, he forfeited the issue of jury instructions as to consent. Furthermore, no error occurred where the jury was instructed as to the elements of the offense of aggravated criminal sexual assault, the State's burden of proof, and the presumption of innocence.

¶ 4 BACKGROUND

¶ 5 Before the events in November 2009, Torres and Maria P. dated for a couple of months, but Maria ended the relationship in late October after he beat her while they were on a date. Maria obtained an order of protection against Torres. Nevertheless, shortly afterward, on November 25, despite the order of protection, Maria P. accompanied Torres to a motel where Torres refused to allow Maria to leave; punched her in the face, arms, and legs; and had sex with her once. On November 27, Torres drove her home. Maria called the police and was interviewed and photographed on November 30 and December 1. The police then arrested Torres and charged him with several offenses. At trial, he raised a defense of consent, asserting that Maria willingly accompanied him to the motel and acquiesced to sexual intercourse.

¶ 6 Before trial began, the State moved *in limine* to allow evidence of prior unrelated acts committed by Torres in 1995 and 1999 against two women with whom he had had romantic relationships, and the October 2009 incident involving Maria which resulted in an order of protection. The trial court denied the State's motion pertaining to the other women as being remote in time, but allowed the State's motion regarding the October 2009 incident.

¶ 7    In a supplemental motion *in limine*, the State sought to admit evidence of another incident that occurred at a restaurant in September 2009. The State's summary included the following: Torres "became enraged" when Maria received a phone call from her employer, "call[ing] her names and hit[ting] her in the face." They left the restaurant and went to Torres' house. Although Maria told him she wanted to go home, she stayed overnight because he "did not want her to leave." The State learned of this incident after the investigator for the defense interviewed Maria. Defense counsel did not object to this evidence. The trial court allowed the State's motion.

¶ 8                                    State's Evidence

¶ 9    Maria, who testified through an interpreter, dated Torres during September and October 2009. They met at a bar on the south side of Chicago where she was a waitress. On their first date at a restaurant, Torres looked at her "in a very strange way" like he wanted to kill her. Maria described their second date, a walk together in a park, as "normal." In September 2009, during their third date while at a restaurant, Maria received a call on her cell phone from her boss, who wanted her to come to the bar to work. She declined, after which her boss put a customer on the phone to say hello. This angered Torres. He started calling Maria insulting names, which made her cry and attracted the attention of a waitress who came over to see if Maria was "okay." Torres and Maria then left the restaurant and went to Torres' car. There, Torres slapped her, pulled her hair, and choked her while he drove. He told her she would "pay for this when we get home," and that she must do everything he told her or "he could hurt [her] badly." Torres drove to his house, where she stayed overnight after he refused to let her go home. Maria did not call the police out of fear.

¶ 10    Maria continued to date Torres because "he told me to forgive him." Maria testified that she did forgive him. Later in October, Torres took her to a tattoo parlor and had his name "Pablo" tattooed on her wrist even though Maria did not want the tattoo. Torres hugged her tightly, which Maria understood to mean she "better" obey his wishes.

¶ 11    In the early hours of October 25, 2009, Torres picked up Maria after work and brought her to his house. She went into the bathroom to wash her face. When she came out, he attacked her, hitting her many times on her face and legs. He choked her and told her not to scream. She realized that he had seen a call from a male friend on her cell phone. After a long time, he stopped and calmed down. He asked for forgiveness. He would not let her leave until much later. Again, she did not call the police. On October 28, she went to the hospital.

¶ 12    At this point in her testimony, the trial court called for a side bar and admonished the State to discontinue questions about October 25 because Maria was relating too much detail about the uncharged offense. Defense counsel moved for a mistrial, which the trial court denied.

¶ 13    Maria testified that after meeting with police officers at the hospital, she obtained an order of protection. Torres continued calling her cell phone and home phone. On November 21, she went to a hotel with him where they spent the night and had sex. Maria explained that she went with Torres that night because she was "scared" and "terrified." Torres apologized and she forgave him.

| | Charged Offenses |
|---|---|

¶ 14                                           Charged Offenses

¶ 15      On November 25, the day before Thanksgiving, Maria agreed to go to a restaurant with Torres to talk. Torres sent his brother, Javier, for Maria. Javier drove her to a supermarket parking lot where they met Torres. Maria got into Torres' car. Instead of going to a restaurant, he drove to a far away motel on the north side of Chicago. Maria had only a jacket and purse with her. On the way, Torres bought Maria hot tea at a McDonald's because she was coughing. Torres checked into the motel and came out "pretty fast." When they went inside their room, which was in the back of the motel, Torres grabbed Maria's purse and used her cell phone to call Maria's daughter, Maritza. He told Maritza that "your mother's with me and she's okay. She's fine." Torres then broke Maria's cell phone and threw it away. He also disconnected the motel telephone; however, he reconnected it after an employee came to their room and told him it could not remain disconnected.

¶ 16      Maria sat down at the end of the bed and drank the tea. She told Torres that she was going back to work on November 27, the day after Thanksgiving. She had been unable to work for a month due to injuries from the "beating that [she] got." Torres became angry and started to beat her, threw the hot tea on her, spit on her face, and threw her on the bed by her hair. He started to squeeze her neck and she fainted. When she regained consciousness, she went to sit in a chair and he began to punch her in the face and kick her. After a long time, he stopped and told her to take her clothes off. She did so slowly because she hurt and then lay down on the bed. Torres punched her in the mouth and blood began to "spurt everywhere." He threw a towel at her, grabbed her and threw her up against the mirror in the bathroom. She saw that her face was swollen and disfigured. He told her to wash her face and take the blood off, and then said "let's go to bed." She again lay down and pretended to sleep while he held her tightly. Whenever she moved slightly, he would check to see if she was sleeping. Torres slept on and off but Maria could not sleep.

¶ 17      The next morning, November 26 (Thanksgiving), Torres' landlady called his cell phone to let him know that the police were looking for him. Torres told Maria that he wanted her to "drop the charges." In the early afternoon, a maid knocked on the door and asked if they wanted clean towels. Torres instructed Maria to sit in the chair near the door. He opened the door a little but Maria could not see the maid from where she sat. Later, Torres ordered food but Maria could not eat.

¶ 18      In time, Torres began to act differently, speaking softly, and asking her to forgive him. He said he wanted to have sexual relations with her. She refused because she was in pain, but he held her hands above her head and had intercourse with her. Afterward, he fell asleep but held her with both his arms. He set the alarm for 5 a.m. because he had to report to work. In the morning, Torres drove her home.

¶ 19      No one was at home when she arrived. She called her daughter, Maritza, who had stayed nearby for the two nights Maria was gone. Maritza returned immediately. Maria called the police the same afternoon but felt too exhausted to go to the hospital. Maritza gave Maria pain pills and she slept.

¶ 20      On November 29, the police interviewed Maria at her home and also photographed her injuries. On November 30, Torres called Maria on her home phone and told her that if she involved the police or if he went to jail, he would kill her. During that evening through the

next morning, Torres called her about 50 times. On December 1, she went to the police station and the police took photographs of her bruised face, arms, and legs.

¶ 21 On cross-examination, Maria admitted that when Torres went to check in at the motel office, he left her alone in a running car. She explained that she did not try to leave because she was afraid. And, she did not try to leave the motel room while Torres used the bathroom because, after the beating, she could not walk. She also did not try to make any telephone calls. Torres twice ordered food delivered, but she did not call out to the delivery person. Maria stated that she continued to date Torres because he threatened her and she feared him. She did not tell anyone that she was afraid of him.

¶ 22 Defense's Evidence

¶ 23 Chicago police officer Salazar testified in the defense's case-in-chief. On November 29, 2009, he interviewed Maria. She told him that Torres struck her, choked her, and grabbed her by the hair. She told him that 30 minutes later Torres "penetrate[ed her] vagina with his penis."

¶ 24 Chicago police detective James Corcoran testified that he and Assistant State's Attorney Holly Kremin interviewed Maria regarding the events of November 25-27, 2009. Through an interpreter, Maria told them that Torres raped her twice and that three phone calls were made from the motel room on Maria's cell phone.

¶ 25 Torres' brother, Javier, testified that Torres did not live with him and their parents. Torres did not have much contact with his parents or siblings. Torres never came for holidays and usually skipped spending the Thanksgiving holiday with his family. Javier stated that, as a favor to Torres, he picked up Maria on November 21 and drove her to meet Torres. Maria entered Javier's car willingly and told him she was excited to see Torres. When they arrived at a Target store parking lot where Torres was waiting, Torres got out of his car and opened the passenger door for Maria. Torres did not grab or push her.

¶ 26 On November 25, Torres again asked Javier to pick up Maria for him. Torres did not tell Javier where they were going or his plans for Thanksgiving. On December 1, when Torres was arrested, he called Javier and asked Javier to post bail.

¶ 27 John Edward Byrne, a private detective, testified that Torres' defense attorney hired him to investigate the case. Byrne discovered Maria's address through a computer search. Byrne went to Maria's residence to interview her but no one answered the first-floor doorbell and the door to an enclosed back porch that led upstairs was locked. On June 22, 2011, Byrne discovered the back porch door had been left unlocked, so he went to the third floor and knocked on the back door. Maria's daughter, Maritza, answered. Byrne gave Maritza his business card and identified himself as a private investigator working for the defense. Maritza then called her mother to the kitchen. Maria's parents were present in the apartment. Byrne then interviewed Maria, with Maritza translating from English to Spanish and vice versa. Byrne took notes during the interview and, after typing up a six-page report, he destroyed his notes. Maria did not tell Byrne that Torres grabbed her and pulled her out of Javier's car and threw her into his car. Nor did Maria tell him that Torres choked her, slapped her, pulled her hair, or that he was physically abusive before they had sex on the last night in the motel.

¶ 28 Torres did not testify. The defense rested.

¶ 29     In closing, defense counsel argued that Maria consented in that, according to Javier's testimony, she was excited to see Torres and willingly got into his car when Javier dropped her off at the supermarket where people were around. Additionally, he argued that Maria did not try to escape despite several opportunities.

¶ 30 Jury Instructions

¶ 31     During the jury instruction conference, defense counsel tendered an instruction regarding aggravated battery as a lesser-included offense of attempted murder. The trial court allowed the instruction over the State's objection. Defense counsel then indicated he had nothing further as to instructions.

¶ 32     The trial court instructed the jury as follows:

> "Evidence has been received that the Defendant has been involved in offenses other than those charged in the indictment. This evidence has been received on the issues of the Defendant's motive, criminal intent, absence of innocent state of mind, and hostility toward Maria [P.] and may be considered by you only for those limited purposes.
>
> It is for you to determine whether the Defendant was involved in those offenses and if so, what weight should be given to this evidence on the issues of motive, criminal intent, absence of innocent state of mind, and hostility towards Maria [P.]"

Criminal sexual assault was defined as: "an act of sexual penetration upon the victim by the use of force or threat of force." The court further instructed the jury that, in order to sustain the charge of aggravated criminal sexual assault, the State must prove beyond a reasonable doubt that: (1) the defendant committed an act of sexual penetration; (2) the act was committed by the use of force or threat of force; and (3) the defendant caused bodily harm, or the defendant acted so as to threaten or endanger the life of the victim, or the criminal sexual assault was perpetrated during the course of the commission of aggravated kidnapping. A separate instruction defined "force or threat of force" as the "use of force or violence or the threat of force or violence including but not limited to when the accused has overcome the victim by use of superior strength, physical restraint or physical confinement."

¶ 33     The jury also was instructed as to the State's burden of proof and the presumption of innocence of the defendant.

¶ 34     The jury retired to deliberate at 1:15 p.m.; at 2:51 p.m. the jury sent a note to the court asking "What was the room number and location of the room in relation to the front desk?" By agreement the trial court responded, "You have all of the evidence. Continue your deliberations."

¶ 35     The jury convicted Torres of aggravated criminal sexual assault, aggravated kidnapping, and aggravated battery as a lesser included offense of attempted murder.

¶ 36 ANALYSIS

¶ 37     Torres argues that: (1) the trial court improperly allowed testimony on the September and October 25 acts of domestic violence; (2) the State provided an inadequate summary of a prior act of domestic violence; and (3) the trial court erred by failing to instruct the jury regarding his consent defense. We affirm.

¶ 39     First, Torres argues that the trial court permitted the State to present extensive and unnecessary detail to the jury in the proof of other crimes. He complains that the amount of detail Maria's testimony related regarding the October incident prejudiced him in the eyes of the jury. The State counters that the testimony was necessary and relevant to establish Torres' lack of innocence and intent and also Maria's state of mind. Further, the trial court instructed the jury regarding the limited use of other-crimes evidence.

¶ 40     Under section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4(a) (West 2008)) (Code), "evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2010). The evidence must be relevant and its probative value must not be substantially outweighed by the risk of undue prejudice. *People v. Dabbs*, 239 Ill. 2d 277, 291 (2010). But, "[e]ven if offered for a permissible purpose, such evidence will not be admitted if its prejudicial effect substantially outweighs its probative value. [Citation.] The admissibility of other-crimes evidence is within the sound discretion of the trial court, and its decision on the matter will not be disturbed absent a clear abuse of that discretion. [Citation.]" *Id.* at 284.

¶ 41     The State moved *in limine* to allow evidence of prior acts committed by Torres against two women and Maria, with all of whom he had had romantic relationships. The trial court denied the State's motion pertaining to the prior acts against the two women as being remote in time, but allowed the State's motion as to two incidents involving Maria that occurred in the months immediately before this incident. During the September 2009 incident, Torres' and Maria's third date, Torres became angry and called her a "f***in bitch, f***in whore." He continued to call her names and slapped her. When they were in his car, he pulled her hair and choked her and said she was "going to pay for this" and he "could hurt her badly" if she did not do everything he told her to do. He would not allow her to leave the car, and once inside his house, he would not let her go home.

¶ 42     On October 25, 2009, Torres picked Maria up after work and brought her to his house, where he attacked her, choked her, and instructed her not to scream. Afterward, he became calm and asked for her forgiveness. He would not let Maria leave his house that night. The next day when she arrived home, she did not call the police. On October 28 she went to the hospital and later after meeting with police officers at the hospital, she obtained an order of protection.

¶ 43     Before Maria testified about the October 25 incident, the trial court instructed the jury that it was about to hear other-crimes evidence for consideration on the issues of motive, criminal intent, absence of intent, state of mind, and hostility toward Maria. The trial court also gave the jury a virtually identical instruction (using the past tense and substituting "evidence" for "testimony") after closing arguments.

¶ 44     Torres characterizes portions of Maria's testimony as "additional evidence of prior crimes and bad acts." He specifically points to the first date testimony where she said Torres looked at her as if he wanted to kill her, and her testimony that he became enraged after grabbing her cell phone and finding calls from a male friend. Torres analogizes this case to *People v. Nunley*, 271 Ill. App. 3d 427 (1995), and *People v. Thigpen*, 306 Ill. App. 3d 29 (1999), claiming that the degree of detail in Maria's testimony amounted to a mini-trial of the other crimes. Both cases are inapposite.

¶ 45    In *Nunley*, our court found reversible error when the trial court allowed testimony about the circumstances of the defendant's confession to a murder he committed 16 months earlier. The defendant spontaneously confessed to the murder while under arrest for aggravated battery of his mother. Several prosecution witnesses testified about the uncharged aggravated battery, including details about the defendant stabbing his mother in an attempt to decapitate her and killing her dog when it tried to protect her. *Nunley*, 271 Ill. App. 3d at 432. While we agreed with the trial court that it was proper to admit some evidence of the later crime to explain the defendant's confession, "the true purpose of this evidence was to portray defendant as a man of bad character." *Id*. Thus, in admitting evidence of other crimes, the trial court must be alert to limiting the details to what is necessary to illuminate the issue for which the other crime was introduced; the admission of the evidence should not lead to a mini-trial of the collateral offense. *Id*.

¶ 46    In *Thigpen*, our court reversed the defendant's murder conviction where the jury heard extensive details of a previous double murder, including a photograph of the deceased victims. The charged crime involved a drive-by shooting at night at a crowded intersection, while the double murder was a daytime kidnapping followed by a shooting in a deserted area. *Thigpen*, 306 Ill. App. 3d at 36. Although our court found the other crimes evidence had some relevance to show a common plan (gang-related shooting) and to prove identity (perpetrator driving a gray car), the evidence presented unnecessary detail and, therefore, any probative value was substantially outweighed by undue prejudice. *Id*. at 35.

¶ 47    As the State argued at the posttrial hearing, Torres' prior actions were offensive, but were not offenses. Fundamental aspects of the State's case include Torres' volatile personality, Maria's reluctance to reveal to anyone how he treated her, and the escalation of violence. The trial court twice instructed the jury to use the evidence for a limited purpose. Maria's testimony not only established the basis on which her relationship with Torres rested; the earlier events also mirrored the circumstances of the charged offenses. Therefore, the trial court properly allowed the evidence of the prior acts (proximity in time, same victim, factual similarity–beating with fists on face, legs; choking; name-calling); the relevance and probative value of this evidence do not outweigh the risk of undue prejudice. We find no abuse of discretion.

¶ 48                        Summary of Other-Crimes Evidence

¶ 49    Torres' second argument relates to his first regarding the other-crimes evidence but more specifically challenges the adequacy of the State's summary of the September 2009 incident. Torres claims that the State provided an inadequate summary of the evidence in its motion *in limine*, thus preventing the trial court from properly analyzing the evidence and preventing Torres from adequately opposing its admission. Torres complains that Maria's testimony about the September 2009 incident improperly expanded on the disclosure in the State's amended motion to admit her testimony. Torres asserts unfair surprise by the amount of detail Maria testified to regarding the September incident because the State's motion *in limine* indicated Maria "was hit in the face" and called names. Torres further asserts that he did not object to the State's amended motion *in limine* to allow evidence of the September 2009 incident because of the State's inadequate factual summary. He requests a new trial as a remedy.

¶ 50    Section 115-7.4(c) of the Code requires: "In a criminal case in which the prosecution intends to offer evidence under this Section, it must disclose the evidence, including statements of witnesses or a *summary of the substance of any testimony*, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." (Emphasis added.) 725 ILCS 5/115-7.4(c) (West 2010). The term "summary" is not defined.

¶ 51    The interpretation of a statute presents a question of law and, thus, is subject to *de novo* review. Our analysis "must begin with the language of the statute itself, which is the most reliable indicator of legislative intent." *People v. Simpson*, 2015 IL 116512, ¶ 29. The court of review gives the statutory language the fullest, rather than the narrowest, possible meaning to which it is susceptible. *Id.*

¶ 52    The parties assert there have been no cases in Illinois interpreting the term "summary," and we found none. We can, nevertheless, find guidance in legislative enactments that use identical language. Illinois Rule of Evidence 404(c) (eff. Jan 1, 2011), provides:

> "In a criminal case in which the prosecution intends to offer evidence under subdivision (b), it must disclose the evidence, including *statements of witnesses or a summary* of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." (Emphasis added.)

Addressing the admissibility of other-crimes evidence under this rule of evidence, our court has held that the proposed evidence must bear "some threshold similarity to the crime charged"; however, less similarity between the crime charged and the evidence of other crimes is allowed when used to show any exception other than to prove *modus operandi*. *People v. Haley*, 2011 IL App (1st) 093585, ¶ 56.

¶ 53    In the context of motions *in limine* to exclude evidence, a "summary" involves something less than a full disclosure of every detail of a witness's testimony. For example, in *People v. Pelo*, 404 Ill. App. 3d 839 (2010), the Fourth District discussed the requirements of an informal offer of proof by defense counsel. An informal offer of proof would be sufficient if counsel informed the court, "with particularity, (1) what the expert testimony will be, (2) by whom it will be presented, and (3) its purpose." *Id.* at 875. The court stated "an informal offer of proof is inadequate if counsel *** *merely summarizes* the witness' testimony in a conclusory manner." (Emphasis added and internal quotation marks omitted.) *Id.* at 875-76. See also *People v. Stevenson*, 2014 IL App (4th) 130313, ¶ 28 ("An offer of proof is inadequate if it is a mere summary ***."). It follows, then, that a "summary" need not contain all that is required by an offer of proof; a lesser amount of detail and particularity suffices.

¶ 54    We turn to the question of whether the State provided an adequate summary of the evidence regarding September 2009. A motion *in limine* addresses a trial court's power to admit or exclude evidence, and we review an evidentiary ruling for an abuse of discretion. *Id.* ¶ 26. The State's motion *in limine*, properly brought under the statute allowing this type of other-crimes evidence, provided details as to time, place, the victim, and acts that were committed by Torres. We find that the trial court acted within its discretion when it granted the motion as to the prior acts against Maria.

¶ 55    Torres also contends the September 2009 incident was inadmissible and may have affected the outcome. He cites *People v. Reed*, 361 Ill. App. 3d 995 (2005), where the defendant argued that the State impermissibly adduced evidence of a previous uncharged

offense against the child victim to show that he had a propensity to commit sex crimes. The court held, under section 115-7.3 of the Code, uncharged sex offenses may be admissible to prove the defendant's propensity to commit the charged sex offense if three conditions exist: (1) the evidence had a "threshold factual similarity" to the charged offense; (2) it did not constitute hearsay; and (3) it was relevant. (Internal quotation marks omitted.) *Id.* at 1000. Each condition has been satisfied here–(1) the facts between the earlier incident and the charged incident are strikingly alike, (2) no hearsay prohibition exists because Maria testified to the events; and (3) the evidence tends to prove propensity and, hence, satisfies the relevance factor. See 725 ILCS 5/115-7.4 (West 2010).

¶ 56                                             Jury Instructions

¶ 57      Torres concedes that he did not tender an instruction defining the defense of consent, nor did he assert in his posttrial motion that it was error to omit the instruction, but argues that the trial court's failure to instruct the jury regarding the State's burden to prove lack of consent beyond a reasonable doubt constituted "grave error" and violated his due process right to a fair jury trial. "[T]he failure to object at trial to an asserted error in jury instructions [forfeits] the question" and "no party may raise on appeal the failure to give an instruction unless he tendered it at trial." *People v. Huckstead*, 91 Ill. 2d 536, 543 (1982). Moreover, Torres did not raise this issue in his posttrial motion for a new trial; therefore, he cannot now complain. *Id.*

¶ 58      Forfeiture aside, Torres asserts that this court should review the jury instruction issue for plain error. Under this doctrine, "[t]o obtain relief, defendant must first show that there was a clear or obvious error. [Citation.] The burden of persuasion remains with defendant, and the first step in plain error review is to determine whether any error occurred. [Citation.]" *People v. Roman*, 2013 IL App (1st) 102853, ¶ 19.

¶ 59      Torres defended the sexual intercourse as a consensual act, thereby focusing on the issue of consent. Maria testified that she did not consent to having sex with Torres. The only other witness who was present, Torres himself, did not testify. The trial court instructed the jury on all elements of the crimes charged, the burden of proof, and the presumption of innocence. Additionally, the trial court instructed the jury that, to sustain the charge of aggravated criminal sexual assault, the first two propositions the State must prove were that Torres "committed an act of sexual penetration" and the act "was committed by the use of force or threat of force."

¶ 60       A victim's consent is relevant to determining whether criminal sexual assault occurred. *People v. Haywood*, 118 Ill. 2d 263, 274 (1987). Our supreme court stated forcing an individual to perform an act renders the act nonconsensual; and "if one freely consents to the performance of an act upon oneself, clearly that person has not been forced." *Id.* Further, "it is obvious that if the prosecution shows that there was an act of sexual penetration by force, that evidence demonstrates that the act was nonconsensual." *Id.* In other words, proving the element of force implicitly shows nonconsent. Indeed, a finding of force negates the possibility of consent as a defense. *Id.*

¶ 61      This court in *People v. Roberts*, 182 Ill. App. 3d 313 (1989), addressing the question of plain error, held no plain error occurred because the jury instructions, to which the defendant offered no objection, adequately stated the law of consent. *Id.* at 318. The court noted that defendant was not required under the instructions to prove consent, and the jury may weigh

"force" evidence against "consent" evidence to determine the presence of force, or a threat of force. *Id*. See *People v. Rollins*, 211 Ill. App. 3d 86, 91 (1991) (force issue and consent issue represent two sides of same coin); *People v. Denbo*, 372 Ill. App. 3d 994, 1004 (2007) (by proving force, State necessarily proves nonconsent).

¶ 62    Under normal circumstances, when a defendant raises consent as a defense to a sexual assault charge and requests that the jury be instructed on that defense, the court should include the bracketed language in Illinois Pattern Jury Instructions, Criminal, No. 11.58 (4th ed. 2000), which requires the State to prove "that [the complainant] did not consent to the act of sexual penetration." Illinois Pattern Jury Instructions, Criminal, No. 11.58 (4th ed. 2000) (hereinafter, IPI Criminal 4th). The companion instructions to IPI Criminal 4th No. 11.58, which define consent and inform the jury that consent is a defense to a charge of aggravated criminal sexual assault, should likewise be given. IPI Criminal 4th Nos. 11.63, 11.63A. But we cannot say that where, as here, the defendant does not request those instructions, the court's failure to give them *sua sponte* constitutes "grave error" regardless of the circumstances of the case.

¶ 63    We recognize that *People v. Coleman*, 166 Ill. App. 3d 242 (1987), reached a contrary result. There the court found plain error occurred because the trial court did not instruct the jury that the State was required to prove lack of consent beyond a reasonable doubt in order for the jury to find the defendant guilty of aggravated criminal sexual assault. But, we adhere to the more flexible approach set forth in *Roberts*. As the ruling in *Rollins* stated: "[W]e are persuaded that the holding in *Roberts*, which examines all the circumstances, including all the instructions to the jury, the statements of counsel, and the weight of the evidence, is the proper approach, rather than *Coleman*, which appears to adopt a *per se* rule of grave error when the jury is not specifically instructed in an issues instruction that the State has the burden to prove nonconsent." *Rollins*, 211 Ill. App. 3d at 89.

¶ 64    As the State points out, defense counsel may well have had a strategic reason to refrain from requesting that the jury be instructed on consent. One theme of the defense at trial was that there were many contradictions in Maria's testimony and the jury could find that, like the other occasions on which they engaged in consensual sex, Maria agreed to have sex with Torres because she "forgave" him. Maria testified that she told Torres she did not want to have sex because she was in too much pain from the earlier beating, but Torres told her he would be "gentle" with her. Defense counsel argued that even if the jury believed Maria's version of events, any force used by Torres ceased the previous day when he stopped beating her. Under IPI Criminal 4th No. 11.63A, the jury would have been instructed that "the lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the defendant shall not constitute consent." Thus, this instruction would have permitted the jury to find that notwithstanding the cessation of the physical assault, Maria did not consent to have sex with Torres. Consequently, under the circumstances, the error, if any, in the trial court's failure to instruct the jury on consent is neither "grave" nor does it warrant reversal of the jury's verdict.

¶ 65    Further, the jury also convicted Torres of aggravated kidnapping, necessarily rejecting the defense theory that Maria willingly went to and remained at the motel. Torres does not challenge the sufficiency of the evidence to sustain this conviction on appeal and since the jury found that Maria was held in the motel room against her will, the likelihood that if the jury had been instructed on consent, it would then have found that the sex was consensual is

virtually nonexistent. Thus, Torres cannot establish prejudice as a result of this claimed error. See *People v. Pitsonbarger*, 142 Ill. 2d 353, 377 (1990) ("Although it is not mandated in every case, *** it is constitutionally permissible for a reviewing court to determine that given the facts of the individual case, the result would be the same had the defect in the [jury] instructions not been present."); *People v. Austin*, 133 Ill. 2d 118, 124 (1989) ("[A]ny error in giving or refusing instructions will not justify a reversal when the evidence in support of the conviction is so clear and convincing that the jury's verdict would not have been different.").

¶ 66                          Ineffective Assistance of Counsel

¶ 67        Finally, Torres argues ineffective assistance based on his counsel's failure to request the instruction. In an analogous case, *People v. Mims*, 403 Ill. App. 3d 884, 890-91 (2010), where defendant faced charges of committing an act of sexual penetration while armed with a firearm, the court held, contrary to the defendant's argument, that the jury did not need the consent instruction to find defendant not guilty because if the jury believed the defendant, then the State failed to prove force by a firearm, a necessary element of the offense. As we already determined, Torres failed to request the instruction regarding consent, the failure of the trial court to give the instruction *sua sponte* was not error, and nothing in the record indicates that the result would have been different had defense counsel requested the instruction. Accordingly, his claim of ineffective assistance of counsel must be rejected.

¶ 68                                     CONCLUSION

¶ 69        We affirm the judgment of the circuit court of Cook County.

¶ 70        Affirmed.